IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DAVID READ,

                Plaintiff,         Civil Action No.
                                       9:11-CV-0459 (GLS/DEP)

   v.

DAWN M. CALABRESE,[1] Counselor
of Programs, Marcy Correctional
Facility; *et al.,*

                Defendants.

_____

APPEARANCES:                   OF COUNSEL:

FOR PLAINTIFF:

DAVID READ, *Pro Se*
10-A-5909
Collins Correctional Facility
P.O. Box 340
Collins, NY 14034

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      ROGER W. KINSEY, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

_____

[1]     In both his initial pleading and more recent amended complaint plaintiff identifies the lead defendant as D. Calabrease.  Dkt. Nos. 1, 39.  Because that defendant's acknowledgment of service form, however, lists her name as Dawn M. CalaBrese, Dkt. No. 26, the clerk is respectfully requested to revise the court's records to reflect the correct spelling of that name.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff David Read, a New York State prison inmate, has commenced this action pursuant 42 U.S.C. § 1983 alleging deprivation of his civil rights and naming the Marcy Correctional Facility and two corrections workers employed at that prison as defendants. Plaintiff's original complaint was dismissed for failure to state a cause of action upon which relief may be granted, with leave to replead. Plaintiff has since filed an amended complaint in which he asserts constitutional claims under the First and Fourteenth Amendments.

In response to plaintiff's amended complaint, defendants have sought its dismissal on a variety of bases. For the reasons set forth below, I recommend that defendants' motion to dismiss be granted, in part, but otherwise denied, and that plaintiff be permitted to pursue his due process and retaliation claims against the two individual defendants.

I.    BACKGROUND[2]

       Plaintiff is a prison inmate currently held in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS").

*See generally* Amended Complaint (Dkt. No. 39).  At the times relevant to his

claims, he was confined in the Marcy Correctional Facility ("Marcy")  located

in Marcy, New York.  *Id.*

       Plaintiff's claims in this case emanate from a written memorandum

issued to him by defendant CalaBrese, a corrections counselor at the facility,

on January 25, 2011.  Amended Complaint (Dkt. No. 39) at 3, 22.  That

memorandum advised plaintiff that his wife, Michelle Read, had been placed

on a negative correspondence/telephone list, which effectively meant that he

would not be permitted to receive visits, telephone calls, or packages from

her during his incarceration.  *Id.*  The notice communicated that the reason

_____

        [2]      In light of the procedural posture of this case, the following recitation is
drawn principally from plaintiff's complaint, the contents of which have been accepted as
true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007)
("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the
factual allegations contained in the complaint."  (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).  Portions of the
background have also been derived from the exhibits attached to plaintiff's amended
complaint, which may also properly be considered in connection with a dismissal motion.
*See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he
complaint is deemed to include any written instrument attached to it as an exhibit or any
statements or documents incorporated in it by reference."); *accord*, *Samuels v. Air Transp.
Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

for placing plaintiff's wife on the negative correspondence list was because she was the subject of an order of protection found to be on file against plaintiff. *Id.* at 22. Plaintiff was warned that any efforts to send correspondence or packages, or to attempt contact by telephone, any person on the prohibited contact list could result in disciplinary action. *Id.*

Following the issuance of that notice, but prior to January 31, 2011, plaintiff lodged a grievance against defendant CalaBrese as a result of the memorandum she had issued to Read earlier in the week. Amended Complaint (Dkt. No. 39) at 3. On January 31, 2011, in apparent response to that grievance, defendant CalaBrese sent the plaintiff a second memorandum explaining further that his wife was the victim of the criminal offense that resulted in plaintiff's incarceration, and that a temporary order of protection was issued with respect to her on July 7, 2010, but expired on January 5, 2011, while plaintiff was in DOCCS custody. *Id.* at 3, 21. The memorandum further stated that defendant CalaBrese had telephoned the Rockland County Sheriff's Department concerning the matter, and was advised that their records revealed an existing order of protection in favor of Michelle Read that was issued by the Haverstraw Court, and would not expire until March 22, 2011. *Id.* at 21. Defendant CalaBrese advised Read to communicate with

4

the Rockland County Court, the Haverstraw Court, and the Suffern Village Court to request verification that there was no active order of protection in place against him and in favor of Michelle Read. *Id.*

On February 1, 2011, the Haverstraw Court provided written confirmation that no active order of protection was in place at the time against plaintiff, and in favor of his wife. Amended Complaint (Dkt. No. 39) at 4 and 23. Upon receipt of that written confirmation, plaintiff requested that his wife be restored to his correspondence list. *Id.* at 4. In an apparent response to that request, defendant Mark D. Kinderman, Deputy Superintendent of Programs at Marcy, sent plaintiff a memorandum, dated February 3, 2011, informing him that, because his wife was the victim of his crime, and information had been received from the Rockland County Sheriff's Department indicating the existence of an active order of protection against him, his wife would remain on the negative correspondence list. *Id.* at 4, 24. In that memorandum, defendant Kinderman made the following further observation:

> I additionally note that you have been extremely uncooperative with Counseling staff who attempted to work on the issue and explain the situation more fully. I strongly advise you to take a more positive approach to your programming, which includes 1-to-1 interviews with staff.

*Id.* at 24.

On February 13, 2011, plaintiff wrote two letters, both addressed to defendant Kinderman. Amended Complaint (Dkt. No. 39) at 5, 25. The second letter included a request to add his wife's telephone number and address, as well as those of plaintiff's mother, to his list of contacts. *Id.* On February 16, 2011, plaintiff was issued a misbehavior report by defendant CalaBrese that alleged he had violated a direct order, provided false information, and violated the facility's internal telephone programming protocol based upon his inclusion of his mother-in-law's telephone number in his letters to defendant Kinderman. *Id.* at 5. Following a disciplinary hearing conducted by defendant Kinderman regarding the misbehavior report, plaintiff was subsequently found guilty of violating prison rules, and was sentenced to confinement in the facility's special housing unit ("SHU") for six months, with an additional recommended loss of ninety days of good time credits.[3] Dkt.

_____

[3]     "In addition to discipline, prisoners may be placed in SHU for [a variety of] reasons[.]" *Lee v. Coughlin*, 26 F. Supp. 2d 615, 618 (S.D.N.Y. 1998) (citing *Justice v. Coughlin*, 941 F. Supp. 1312, 1320 (N.D.N.Y. 1996) (Pooler, J.), *abrogation recognized on other grounds by Rabb v. McMaher*, No. 94-CV-0614, 1998 WL 214425, at *2 (N.D.N.Y. Apr. 24, 1998) (Pooler, J.). Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. § 304. They are allowed two showers per week and one of hour of outdoor exercise per day. *Husbands*, 990 F. Supp. at 217; *see also* 7 N.Y.C.R.R. §§ 304.5(a), 304.3. They are entitled to unlimited legal visits and one non-legal visit per week. *Husbands*, 990 F. Supp. at 218; *see also* 7 N.Y.C.R.R. § 302.2(j)(1)(I). SHU inmates have access to counselors and sick call. *Husbands*, 990 F. Supp. at 218; *see also* 7 N.Y.C.R.R. §§ 304.10, 304.4(c).

No. 42-1 at 3-4.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on April 22, 2011.  Dkt. No. 1.

Following an initial review of plaintiff's complaint and accompanying *in forma*

*pauperis* ("IFP") application, Chief District Judge Gary L. Sharpe issued a

decision and order, dated October 11, 2011, granting plaintiff's request for

IFP status, denying his motion for appointment of counsel, dismissing his

false misbehavior claim against defendant CalaBrese, and directing that

Read provide a waiver pursuant to *Peralta v. Vasquez*, 467 F.3d 98 (2d Cir.

2006), *cert. denied sub nom.*, *Jones v. Peralta*, 551 U.S. 1145 (2007),

relinquishing any claims affecting the length of his confinement, including the

loss of good time credits associated with the disciplinary sentence at issue in

the case.  Dkt. No. 13.  Plaintiff filed his *Peralta* waiver on October 26, 2011.

Dkt. No. 15.

A second decision and order was subsequently issued by Chief Judge

Sharpe on March 7, 2012, in which the court (1) acknowledged and accepted

plaintiff's *Peralta* waiver, and dismissed all claims in the action affecting the

duration of his confinement; (2) denied plaintiff's motion for a preliminary

---

Additionally, they can participate in cell study programs and can receive books from the
library.  *Husbands*, 990 F. Supp. at 218; *see also* 7 N.Y.C.R.R. §§ 304.11, 304.7, 304.12.

injunction preventing defendant Kinderman from abusing his authority; and

(3) denied plaintiff's request to take action concerning interference with his

legal mail in other cases.  *See generally* Dkt. No. 20.  That decision also

directed defendants to respond plaintiff's complaint.  *Id.*  Plaintiff's motion for

reconsideration of that determination, Dkt. No. 22, was denied by decision

and order issued by Chief Judge Sharpe on June 21, 2012, Dkt. No. 35.

Defendants responded to the plaintiff's complaint by moving for its

dismissal based on a variety of grounds.  Dkt. No. 30.  By memorandum-

decision and order issued by Chief Judge Sharpe on August 2, 2012, that

motion was granted, though with leave to amend.  Dkt. No. 37.

On August 29, 2012, plaintiff filed an amended complaint, Dkt. No. 30,

and has since supplemented that amended complaint with the filing of a

series of documents, including a memorandum of law, Dkt. No. 42.  Liberally

construed, plaintiff's amended complaint alleges that defendants deprived

him of procedural due process and unlawfully retaliated against him by the

issuance of an allegedly false misbehavior report.[4]  *Id.*  Plaintiff's amended

---

[4]     To the extent that plaintiff's amended complaint purports to assert a claim
against defendant Kinderman for a failure to properly investigate plaintiff's grievance, that
claim must fail.  It is well-established that prisoners do not have a constitutionally
protected right to an investigation into grievances.  *Tafari v. McCarthy*, 714 F. Supp. 2d
317, 344 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.).

complaint does not specify the relief sought.

In response to plaintiff's amended complaint, defendants have once again filed a motion to dismiss based on various grounds. Specifically, defendants argue that plaintiff's complaint is subject to dismissal because (1) defendants are entitled to Eleventh Amendment immunity, (2) plaintiff cannot recover monetary damages in light of the absence of an allegation of physical harm, (3) plaintiff failed to exhaust the available administrative remedies before commencing suit, (4) the complaint fails to state a claim upon which relief may be granted, (5) plaintiff is precluded from challenging his disciplinary hearing conviction, and (6) defendants are entitled to qualified immunity from suit. *See generally* Defs.' Memo. of Law (Dkt. No. 40-1). Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 46.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   <u>DISCUSSION</u>

A.   <u>Dismissal Motion Standard</u>

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)).  While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions.  *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546

(1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.    Failure to Exhaust

As an initial procedural matter, defendants argue that plaintiff's claims are precluded based upon his failure to the exhaust available administrative remedies before commencing suit.  Defs.' Memo. of Law (Dkt. No. 40-1) at 5-6.  Defendants highlight the fact that plaintiff's amended complaint includes no allegations regarding exhaustion, including whether he pursued any grievances concerning the relevant events through to completion under the available inmate grievance program.  *Id.*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section

1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).

---

[5] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

In this case, plaintiff's amended complaint and supplemental submissions provide little information regarding any grievances that he may have filed related to his claims in this case, including whether they were denied, and by whom. *See generally* Dkt. Nos. 39, 42. Those omissions, however, are not fatal to his claims at this juncture because, as noted above, whether a complaint alleges complete exhaustion is not dispositive on a motion to dismiss. *Jones*, 549 U.S. at 216. For this reason, the exhaustion defense is one that is not particularly well-suited for resolution for a motion to dismiss, absent the clearest indication in a plaintiff's complaint that a failure to exhaust has occurred. *See*, *e.g.*, *Laporte v. Fisher*, No. 11-CV-9458, 2012 WL 5278543, at *5 (S.D.N.Y. Oct. 24, 2012) ("Dismissal pursuant to Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)).[6]

---

[6]     I note that in *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit suggested that, even if a prisoner's complaint alleges sufficient facts for a court to determine that he failed to exhaust the available administrative remedies before filing suit, dismissal on that basis would be improper. *Grullon*, 720 F.3d at 141-42. In that case, the Second Circuit reversed the district court's denial of the plaintiff's motion for leave to amend, where part of the administrative remedies provided for by Connecticut state regulations requires that a prison official respond to a prisoner's informal, written attempt to resolve a matter within fifteen days. *Id.* at 138. The district court denied the plaintiff leave to amend because, *inter alia*, even construing the complaint with the utmost liberality, it alleged facts that would make it impossible for the plaintiff to have waited the requisite fifteen days to receive a response from a prison official before commencing suit,

Because it is unclear whether the plaintiff fulfilled his obligation to

exhaust available administrative remedies before commencing this action, I

recommend that defendants' motion to dismiss based on these grounds be

_____

thereby rendering it impossible for him to have exhausted the available administrative
remedies. *Id.* In reversing the district court's determination, the Second Circuit made the
following pronouncement:

> More importantly, the [district] court's legal framework for
> assessing the sufficiency of [the plaintiff]'s proposal to amend
> his complaint was flawed, because although claims relating to
> prison conditions are subject to the PLRA's exhaustion
> requirement, failure to exhaust is an affirmative defense, and
> inmates are not required to specially plead or demonstrate
> exhaustion in their complaints. Thus, even if there were fewer
> than 15 days between the Warden's receipt of [the plaintiff]'s
> [l]etter and [plaintiff]'s filing of his complaint, that would not
> have affected the complaint's sufficiency.

*Id.* at 141-42 (quotation marks and citations omitted).

This holding appears contrary to existing case law, including the Supreme
Court's decision in *Jones*, that suggests that a plaintiff may plead himself out of court by
alleging sufficient facts for the court to conclusively determine that he has failed to exhaust
the available administrative remedies before filing suit. *See Jones*, 549 U.S. at 216
("[T]hat is not to say that failure to exhaust cannot be a basis for dismissal for failure to
state a claim."). To the extent that the Second Circuit intended to hold in *Grullon* that a
district court may not dismiss a complaint that, on its face, alleges the plaintiff failed to
exhaust, it is difficult to square that holding with decisions addressing the exhaustion
affirmative defense in other contexts, as well as analogous affirmative defenses, such as
the statute of limitations. *See, e.g.*, *Jones*, 549 U.S. at 215 ("If the allegations [in a
complaint] . . . show that relief is barred by the applicable statute of limitations, the
complaint is subject to dismissal for failure to state a claim; that does not make the statute
of limitations any less an affirmative defense."); *Levine v. Greece Cent. Sch. Dist.*, 353 F.
App'x 461, 463 (2d Cir. 2009) ("Under those circumstances, when a complaint on its face
shows that there is no possibility that it could be amended to allege facts that, if true,
would demonstrate that the plaintiff satisfied the exhaustion requirement, failure to
exhaust is a proper ground for a motion to dismiss." (citing *Mosley v. Bd. of Educ.*, 434
F.3d 527, 533 (7th Cir. 2006); *U.S. v. Moreno-Rivera*, 472 F.3d 49, 50 n.2 (2d Cir. 2006))).

denied, without prejudice to renewal at an appropriate procedural juncture.[7]

_____

[7]  It should be noted that exhaustion through the normal channels may not have been required under the PLRA in this case with respect to his due process claim.  As an exception to the requirement of proceeding through normal grievance process available at a particular facility, "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *3 (Mar. 31, 2010) (Suddaby, J.) (emphasis omitted) (citing *Giano v. Goord*, 380 F.3d 670, 678-79 (2d Cir. 2004)); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).  An appeal from a disciplinary hearing that raises the precise procedural infirmities raised in the section 1983 action, for example, may be sufficient to exhaust administrative remedies.  *LaBounty v. Johnson*, 253 F. Supp. 2d 496, 502 n.5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002)).  The court in *Flanagan* declined to dismiss the plaintiff's due process claim for failure to exhaust, reasoning that,

> [t]o require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [section] 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Flanagan*, 2002 WL 122921, at *2.  Although the Second Circuit has not squarely addressed the issue, at least one court within this circuit has endorsed the court's reasoning in *Flanagan*, and refused to require exhaustion where an inmate has pursued his disciplinary appeals to the highest levels without success, and then claimed due process violations with respect to the disciplinary hearing in the context of a section 1983 action.  *Khalid v. Reda*, No. 00-CV-7691, 2003 WL 42145, at *4 (S.D.N.Y. Jan. 23, 2003) (citing *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *8 (S.D.N.Y. Sept. 12, 2002)).

  In this case, plaintiff's amended complaint alleges that he was not provided sufficient due process during his disciplinary proceeding, which resulted in, *inter alia*, SHU confinement.  If plaintiff can demonstrate that he raised the same objections he has now brought before the court in his disciplinary hearing and on appeal, he may have effectively

C.  *Heck v. Humphrey*

In their motion, defendants next assert that plaintiff is precluded from pursuing his claim for damages arising out of the disciplinary proceedings against him under *Heck v. Humphrey*, 512 U.S. 477, 1994, in light of his failure to first invalidate the adverse hearing determination.  Defs.' Memo. of Law (Dkt. No. 40-1) at 12-13.

In its decision in *Heck*, the Supreme Court held that a state prisoner's claim for damages under 42 U.S.C. § 1983 is precluded if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence" absent proof that the inmate has already secured invalidation of that conviction or sentence.  *Heck*, 512 U.S. at 487.  In 1997, the Supreme Court issued its decision in *Balisok*, which, in essence, extended *Heck*.  The Court in *Balisok* held that a plaintiff's claim for damages arising from allegations of a violation of procedural due process in the context of a prison disciplinary hearing is not cognizable under section 1983 where the nature of the due process challenge necessarily implies the invalidity of the disciplinary determination issued and/or punishment imposed, unless the disposition has already been reversed through a state administrative or judicial habeas

exhausted the available administrative remedies for purposes of the PLRA with respect to that particular claim.

proceeding. *Balisok*, 520 U.S. at 645. These two cases, however, do not apply to all suits challenging prison disciplinary proceedings. *Mohammad v. Close*, 540 U.S. 749, 754 (2004).

Since the Court's decision in *Balisok* was rendered, the Second Circuit has interpreted *Balisok* and *Mohammed* to distinguish between those cases involving challenges to disciplinary penalties that only affect the conditions of an inmate's confinement – including disciplinary segregation such as keeplock and solitary confinement – and those resulting in the imposition of sanctions impacting upon an inmate's good-time credits. *Jenkins v. Haubert*, 179 F.3d 19, 22-23 (2d Cir. 1999). Applying *Balisok*, the Second Circuit concluded that a plaintiff challenging only the conditions of his confinement, where no good time credits have been lost as a result of the disciplinary hearing at issue, need not show as a threshold matter that the disciplinary hearing decision and sentence were reversed or invalidated. *Jenkins*, 179 F.3d at 27. Since the plaintiff in *Jenkins* was not attacking the fact or length of his confinement, either directly or indirectly, it was not necessary for him to invalidate the prison hearing officer's judgment against him prior to bringing a section 1983 claim for damages. *Id.*

Notwithstanding the rule announced in *Balisok* and carried over into the

Supreme Court's later decision in *Mohammad*, the Second Circuit has clarified that if, as a prerequisite for maintaining his section 1983 action, a prisoner agrees to abandon, once and for all, the portion of his challenge directed to the duration of incarceration, then success in the section 1983 action will have no affect on the sanctions that relate to the length of time served in prison, and, accordingly, the inmate can proceed with his due process claim. *Peralta*, 467 F.3d at 105. Under *Peralta's* limited exception to the rule in *Balisok*, in order to pursue his section 1983 due process claim in this action, plaintiff must therefore abandon – not just at present, but for all time – any claims he may have with respect to the duration of his confinement that arise out of the proceeding now challenged. *Id.* at 104.

The plaintiff in this case has made such a commitment. Dkt. No. 15. Plaintiff's *Peralta* waiver has been acknowledged and accepted by the court, and all claims in this action relating to disciplinary sanctions imposed that affect the duration of his confinement have been dismissed. Decision and Order (Dkt. No. 20) at 3. I therefore recommend a finding that *Heck* does not provide a basis for dismissal of plaintiff's procedural due process claim under the circumstances of this case.

D.    Recovery of Compensatory Damages

In their motion, defendants also challenge plaintiff's request for an award of compensatory damages based upon his failure to allege that he suffered a physical injury as a result of the defendants' alleged unconstitutional conduct.  Defs.' Memo. of Law (Dkt. No. 40-1) at 6.

Pursuant to 42 U.S.C. § 1997e, "[n]o Federal civil action may be brought by a prisoner confined in a . . . correctional facility[] for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The Second Circuit has held that section 1997e(e) applies to all federal civil actions, including those pursuant to 42 U.S.C. § 1983.  *Thompson v. Carter,* 284 F.3d 411, 417-18 (2d Cir. 2002).  As such, "[c]laims brought by prisoners pursuant to [section] 1983 for . . . damages unrelated to any physical injuries are subject to dismissal."  *Shariff v. Coombe*, No. 96-CV-3001, 2002 WL 1392164, at *4 (S.D.N.Y. June 26, 2002).  The absence of physical injury does not totally bar civil rights claims by inmates, however, because section 1997e(e) does not preclude claims for nominal damages, punitive damages, or declaratory or injunctive relief.  *Shariff*, 2002 WL 1392164, at *5.

Defendants are correct that plaintiff's complaint is devoid of any

indication that he experienced physical injury as a result of their conduct. *See generally* Amended Complaint (Dkt. No. 39). Moreover, in his response opposing defendants' motion, plaintiff has failed to controvert that assertion. *See generally* Plf.'s Resp. (Dkt. No. 46). Although it is not clear from plaintiff's amended complaint whether he seeks monetary damages as relief, his original complaint sought $800,000 in damages. Complaint (Dkt. No. 1) at 6. Accordingly, to the extent that plaintiff continues to seek compensatory damages in his amended complaint, I recommend dismissal of plaintiff's claim for recovery of compensatory damages on this independent basis.

E. Eleventh Amendment

Defendants next seek dismissal of plaintiff's claims against Marcy Correctional Facility ("Marcy"), and his damage claims against the two individual defendants in their official capacities. Defs.' Memo. of Law (Dkt. No. 40-1) at 4-6. This is an argument that has previously been raised and addressed by the court, specifically in Chief Judge Sharpe's memorandum-decision and order dated August 2, 2012, and plaintiff's amended complaint does not allege any facts that would alter the result of that decision. Memorandum-Decision and Order (Dkt. No. 37) at 7-8. Accordingly, to the extent that plaintiff's amended complaint attempts to reassert damage claims

against Marcy and the two individual defendants in their official capacities, I recommend that they be dismissed as precluded under the Eleventh Amendment.

F.     Eighth Amendment

In his decision and order dated August 2, 2012, Chief Judge Sharpe also construed plaintiff's original complaint as asserting an Eighth Amendment claim based upon the conditions plaintiff alleged he experienced in SHU confinement.  Memorandum-Decision and Order (Dkt. No. 37) at 8-13.  Finding a lack of any allegations concerning the conditions which he experienced in SHU, that potential Eighth Amendment claim was dismissed with leave to replead.  *Id.*  Having carefully reviewed plaintiff's amended complaint, I am unable to discern any new allegations that would give rise to a cognizable Eighth Amendment claim.  Accordingly, to the extent that plaintiff's amended complaint could be construed as asserting such a claim, I recommend that it be dismissed.

G.     Procedural Due Process

At the heart of plaintiff's amended complaint is his contention that, during the course of disciplinary proceedings against him, he was denied procedural due process in violation of the Fourteenth Amendment.  *See*

*generally* Amended Complaint (Dkt. No. 39). Specifically, although the amended complaint is less than clear, it appears that plaintiff alleges that his due process claim arises from his sentence of SHU confinement. *Id.* Defendants seek dismissal of this claim, arguing both that plaintiff was not deprived of a cognizable liberty interest sufficient to trigger the Fourteenth Amendment's due process protections, and that, in any event, he received all of the process due under that provision. Defs.' Memo. of Law (Dkt. No. 40-1) at 8-9.

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

1.  <u>Liberty Interest</u>

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually

23

created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, to find that plaintiff's amended complaint states a cognizable due process claim, I must inquire whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the

---

[8] In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)).  In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations.  *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

The allegations in this case concerning the length of plaintiff's SHU confinement arising from the disciplinary proceedings against him are nebulous at best.  In his original complaint, plaintiff alleges that, as a result of his guilty conviction at the disciplinary proceeding at issue, he was sentenced to ninety days of SHU confinement.  Complaint (Dkt. No. 1) at 10, 12, 26.  In plaintiff's more recent submission supplementing his amended complaint, however, it is alleged that he spent six months in SHU confinement.  Dkt. No. 42-1 at 3.  Because I am bound to extend special solicitude to a *pro se* litigant's proceedings, and because plaintiff's original complaint, which alleges that he was confined in SHU for only ninety days, is no longer operative, I find that the allegation contained in plaintiff's amended complaint and supplemental submissions in this regard are sufficient to plausibly

suggest that his confinement was atypical under *Sandin*.[9]

## 2. Procedural Safeguards

Having determined that plaintiff could potentially establish that he was

deprived of a constitutionally significant liberty interest, the court must next

assess whether he was afforded the requisite due process in connection with

that deprivation. The procedural safeguards to which a prison inmate is

entitled before being deprived of a constitutionally cognizable liberty interest

are well established, the contours of the requisite protections having been

articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-69 (1974). Under *Wolff*,

the constitutionally mandated due process requirements include (1) written

notice of the charges to the inmate; (2) the opportunity to appear at a

disciplinary hearing and present witnesses and evidence in support of his

defense, subject to a prison facility's legitimate safety and penological

concerns; (3) a written statement by the hearing officer explaining his

---

[9]       While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon*, 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality requirement, *id.* at 232 n.5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *See id.* at 231-32 (holding that 305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon*, the panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-70; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985).

In this case, defendants' motion focuses on whether the timing of the disciplinary hearing comported with both state regulations and due process.[10] This position appears to overlook the primary thrust of plaintiff's procedural due process claim, which is that the hearing officer's determination was not supported by sufficient, competent evidence. Specifically, liberally construing the amended complaint, it is alleged that plaintiff was found guilty at the disciplinary hearing notwithstanding the fact that he had provided evidence to suggest that no order of protection was in place against him and in favor of his wife, and that he had provided prison officials with a phone number

---

[10]     In several of his submissions, plaintiff cites to New York State regulations which, he asserts, have been violated throughout the course of disciplinary proceedings against him. *See*, *e.g.*, Dkt. No. 46 at 19. It is well-established, however, that a violation of a state law or regulation is not actionable under section1983. *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.").

belonging to his mother-in-law, rather than his wife. Amended Complaint

(Dkt. No. 39) at 5-6. Although the amended complaint also alleges that

defendants CalaBrese and Kinderman told plaintiff that they had found a

order of protection in place by the Rockland County Sheriff's Department,

and thus raises a question of whether plaintiff's due process claim has merit,

I am inclined to deny defendant's motion at this early stage. The parties

should have the opportunity to explore, through discovery, whether an order

of protection was in place, whether its existence somehow provided support

for the disciplinary charges asserted against plaintiff, and whether plaintiff's

inclusion of his mother-in-law's phone number in his letter dated February 13,

2011, and addressed to defendant Kinderman, provided support for the guilty

finding. Accordingly, I recommend that defendants' motion for dismissal of

plaintiff's procedural due process claim be denied as premature at this

juncture.

    H.    <u>Retaliation</u>

      The second of the two claims asserted in plaintiff's amended complaint

is based on allegations that he was issued a false misbehavior report by

defendant CalaBrese, in retaliation for having filed a grievance regarding the

placement of his wife on his restricted communication list. Amended

Complaint (Dkt. No. 39) at 3-6.  Defendants seek dismissal of this claim

arguing succinctly that, "[w]ith regard to plaintiff's claims against Defendant

Cala[B]rese, plaintiff has failed to allege any cognizable claim against her

and the complaint should be dismissed."  Defs.' Memo. of Law (Dkt. No. 40-

1) at 9.

It is well-established that standing alone, the mere allegation that a

false misbehavior report has been filed against an inmate does not give rise

to a cognizable constitutional claim.  *Boddie v. Schnieder*, 105 F.3d 857, 862

(2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986).  A

cognizable section 1983 retaliation claim lies, however, when prison officials

take adverse action against an inmate, motivated by the inmate's exercise of

a constitutional right, including the free speech provisions of the First

Amendment.  *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)

("In general, a section 1983 claim will lie where the government takes

negative action against an individual because of his exercise of rights

guaranteed by the Constitution or federal laws.").  To state a *prima facie*

claim under section 1983 for retaliatory conduct, a plaintiff must advance

non-conclusory allegations establishing that (1) the conduct at issue was

protected, (2) the defendants took adverse action against the plaintiff, and (3)

there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

In this case, plaintiff's amended complaint states a plausible retaliation claim against defendant CalaBrese. In support of his retaliation claim, plaintiff alleges that he filed a grievance complaining about defendant CalaBrese's actions regarding placement of his wife's name on his restricted communication list. Amended Complaint (Dkt. No. 39) at 3. It is well-settled that the filing of a grievance constitutes constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). The amended complaint further

alleges that shortly thereafter, defendant CalaBrese issued a false misbehavior report against plaintiff, accusing him of violating prison rules, an act that can suffice to establish adverse action. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[The plaintiff] sufficiently alleged . . . adverse action on the part of the defendants – the filing of false misbehavior reports against [him] and his sentence . . . – that would deter a prisoner of ordinary firmness from vindicating his . . . constitutional rights through the grievance process[.]"). Plaintiff's complaint has also pleaded sufficient facts to satisfy the third, causation element of a retaliation analysis. In the context of the issuance of disciplinary charges alleged to have been prompted by retaliatory animus, analysis of the third element, causation, is informed by several relevant factors, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act, (2) the inmate's prior good disciplinary record, (3) vindication at a hearing on the matter, and (4) statements by the defendant concerning his . . . motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.), *report and recommendation adopted by* 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) (Mordue, J.). Liberally construed, Read's amended complaint alleges that causation is premised upon the close proximity in time between the

grievances filed by him, and the allegedly retaliatory false misbehavior report issuance.  *See* Amended Complaint (Dkt. No. 39) at 3-5 (alleging that he filed a grievance against defendant CalaBrese between January 25-31, 2011, and he was issued the false misbehavior report in or about mid-February 2011 related to the contents of his grievance against defendant CalaBrese).  At this early state in the litigation, such allegations are sufficient to satisfy the causation element.  *See*, *e.g.*, *Bennett v. Goord*, 343 F.3d 133 (2d Cir. 2003) (finding that the plaintiff's complaint satisfied the causation element, where it was alleged that the misbehavior report was issued "just days after [the plaintiff] filed his grievance"). I therefore recommend that defendants' motion with respect to this claim be denied.

I.  <u>Qualified Immunity</u>

In their motion, defendants request dismissal of plaintiff's claims against them on the basis of qualified immunity.  Defs.' Memo. of Law (Dkt. No. 40-1) at 13-15.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir.

2012).  The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson*, 555 U.S. at 231.  Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct.  *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors.  *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).  Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, "whether that right was 'clearly established' at

the time of the events at issue." *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir.

2011) (citing *Saucier*, 533 U.S. at 194, 201, 202); *accord*, *Sira v. Morton*, 380

F.3d 57, 68-69 (2d Cir. 2004).  The Supreme Court has said that an officer's

"conduct violates clearly established law when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable

official would have understood that what he is doing violates that right."

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks

and alterations omitted).  However, "[e]ven where the law is 'clearly

established' and the scope of an official's permissible conduct is 'clearly

defined,' the qualified immunity defense also protects an official if it was

'objectively reasonable' for him at the time of the challenged action to believe

his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir.

2007) (citations omitted).  This "objective reasonableness" part of the test is

met if "officers of reasonable competence could disagree on [the legality of

the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Plaintiff's two remaining claims in the action assert a violation of his

procedural due process rights under the Fourteenth Amendment, and

unlawful retaliation in violation of the First Amendment.  Both of these rights

were firmly established at the relevant times.  Unfortunately, the court is not

well positioned at this early juncture, based only on the allegations set forth in plaintiff's amended complaint, to determine whether it was objectively reasonable for the defendants to believe that their conduct did not run afoul of those constitutional provisions. Simply stated, because the qualified immunity analysis is closely intertwined with the merits of the case, and notwithstanding the Second Circuit's admonition that qualified immunity be decided at the earliest possible juncture, *Pearson*, 555 U.S. at 231, I conclude that it is premature to address the issue based upon the scant record now before the court.

J. Whether to Permit Further Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where the court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). In this instance, given the procedural history of the

action, the court must determine whether plaintiff is entitled to the benefit of this general rule.

This action has been pending for more than two years, during which issue has not been joined, and discovery has yet to be commenced. Plaintiff has been given considerable guidance, through the issuance of several decisions from the court, concerning the requirements necessary to support his various claims, most recently in the form of an order dismissing his complaint in its entirety, with leave to replead. Under these circumstances, and having carefully reviewed plaintiff's various submissions, I conclude that plaintiff has been given adequate opportunity to cure the defects identified in his pleadings, and, with respect to some of his claims, he has either been unable to cure them or deliberately ignored the court's guidance. For example, although Chief Judge Sharpe explained the concept of immunity under the Eleventh Amendment in his decision dated August 2, 2012, Dkt. No. 37, plaintiff insists that immunity does not apply. *See* Amended Complaint (Dkt. No. 39) at 1 ("The State therefor[e] is not entitled to absolute immunity."). Accordingly, I find that no useful purpose would be served in permitting a further amendment, that such an opportunity would be an exercise in futility, and that defendants will suffer undue prejudice in further

delay.  I therefore recommend that plaintiff not be afforded the opportunity to file a second amended complaint in the action to cure the deficiencies discussed above in Parts III.D., E., and F. of this report.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint alleges that defendant CalaBrese issued a misbehavior report falsely accusing him of violating prison rules, and that during the course of the ensuing disciplinary proceeding, resulting in his disciplinary confinement in a facility SHU, he was denied due process in that the hearing officer, defendant Kinderman, was biased and his determination was not supported by the evidence.  While drawing no conclusions as to whether plaintiff will ultimately be able to substantiate these claims, either at trial or in defense of a motion for summary judgment, at this juncture I recommend a finding that those two claims have been plausibly alleged.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 40) be GRANTED in part, and denied in part, as follows:

(1)    Plaintiff's claims against the Marcy Correctional Facility and his claim for damages against defendants CalaBrese and Kinderman in their official capacites be DISMISSED;

(2)    Plaintiff's compensatory damage claims against all defendants be DISMISSED, pursuant to 42 U.S.C. §

1997e(e);

(3) Plaintiff's Eighth Amendment claims be DISMISSED; and

(4) Plaintiff's Fourteenth Amendment due process and First Amendment retaliation claims survive defendants' motion to dismiss, and that defendants be directed to respond to the amended complaint to the extent that it asserts those claims.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:   August 29, 2013
         Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented
separately from NHCC. Accordingly, when a
distinction is necessary, Reilly and NCCF will be
referred to as "County Defendants" and Nassau
County University Medical Staff and NHCC will
be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through
medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶
3. This standard process usually takes seventy-two hours.
Edwards Aff. ¶ 4. During medical intake, NCCF tests
inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.")
¶ 3. NCCF generally uses a PPD test to detect latent TB.
Feleke Aff. ¶ 3. However, if an inmate has previously
tested positive for TB, it is NCCF's policy to test for TB
using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its
Infectious Disease Program, NCCF re-tests inmates for TB
each year, beginning after they have been housed in that
facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin
test should not be done for people who have a(1)
Known TB infection [or a] (2) Positive
tuberculin skin test in the past. A second test may
cause a more severe reaction to the TB antigens."
Jan Nissl, RN, BS, *Tuberculin Skin Tests,*
W E B M D , h t t p : / /
www.webmd.com/hw/lab_tests/hw203560.asp
(last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the
general population, Hargrove was processed through
medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The
NCCF Medical Intake Chart for Hargrove, dated March
15, 2002 ("3/15/02 Chart"), shows that Hargrove informed
medical staff that he had previously been exposed to
tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1;
NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also
shows that Hargrove reported testing positive to a prior
PPD test and that he had been treated for TB in 2000.
NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges
that he was exposed to and treated for TB in 1997.
Hargrove's Aff. in Opp. to Mot. for Summary Judgment,
("Aff. in Opp."), Ex. A at 1-2. Defendants contend that
Hargrove was given an x-ray during the medical intake
process because of his reported positive PPD test, and that
the x-ray was negative, showing no active TB infection.
NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3.
Without specifying a date, Hargrove generally states that
his "request to be x-rayed was denied." Aff. in Opp. at 3.

*2 Pursuant to NCCF's Infectious Disease Program, after
being incarcerated in NCCF for a year, Hargrove was
scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC
Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove
was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.'
56.1 Statement ¶ 4. This test was negative. Edwards Aff.
¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to
Hargrove, he requested an x-ray instead of a PPD test
because of his previous exposure to TB, but was forced to
submit to the PPD test. He also alleges that defendants
threatened to put him in "keep lock" or "lock up" unless
he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in
Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory
statements about being placed in "keep lock" or
"lock up". It is unclear whether he is alleging that
defendants threatened to place him in "lock up"
unless he submitted to the PPD test or whether he
was actually placed in "lock up" until such time
that he agreed to submit to the PPD tests. For
example, in his complaint, Hargrove states that
when he "refused to submit to another [PPD]
test, the Correctional Authorities were brought in
and placed [him] in lock up." Complaint ¶ 4. In
a hearing before Magistrate Judge Bloom on

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

### (3)

### Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero, 467 F.3d at 175;Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, see *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Hector LAPORTE, Plaintiff,
v.
Correction Sergeant FISHER and Correction Officer
Banks, Defendants.
No. 11 Civ. 9458(PKC)(HBP).

Oct. 24, 2012.
*MEMORANDUM AND ORDER*

[P. KEVIN CASTEL](), District Judge.

**\*1** Plaintiff Hector Laporte, proceeding *pro se,* brings this action pursuant to 18 U.S.C. § 1983 against Correction Sergeant Fisher and Correction Officer Banks in their individual and official capacities. Plaintiff asserts that defendants used excessive force against him in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Defendants Fisher and Banks move to dismiss the claims against them to the extent they are sued in their official capacities, as these claims are barred by the Eleventh Amendment. Defendant Banks further moves to dismiss all claims against him on the grounds of failure to state a claim upon which relief can be granted, qualified immunity, and failure to comply with the administrative exhaustion requirements of the Prison Litigation Reform Act, [42 U.S.C. § 1997e]() (the "PLRA"). For the reasons stated below, defendants' motion to dismiss all claims against them in their official capacities on the grounds of Eleventh Amendment immunity is granted. Defendant Banks' motion to dismiss on the grounds of failure to state a claim and qualified immunity is denied, and his motion to dismiss for failure to exhaust is converted into a motion for summary judgment, and denied.

BACKGROUND

Plaintiff is an inmate at Sing Sing Correctional Facility ("Sing Sing"). (Compl.¶ I–A.) Plaintiff alleges that while incarcerated at Sing Sing, he was assaulted on April 24, 2011 by defendant Banks, and on July 4, 2011 by defendant Fisher. (*Id.* ¶ II–D.)

According to the Complaint, on April 24, 2011 plaintiff was attempting to go to the chapel when he was stopped by defendant Banks. (*Id.* ¶ II–D, Ex. B "Banks Grievance.") Defendant Banks allegedly accused plaintiff of "playing games with [defendant Banks] and the facility" by "using the chapel as a way just to come out of [plaintiff's] cell." (*Id.* Ex. B.) Defendant Banks then asked plaintiff for his identification card. Upon production of the identification card, plaintiff alleges that defendant Banks "became aggressive, and started pushing, shoving, and eventually punched [plaintiff] in the stomach." (*Id.*) The impact of the punch allegedly caused plaintiff to lose his breath. (*Id.*) Plaintiff asserts that defendant Banks continued to threaten and harass him for a period of time following this incident, such that plaintiff has been afraid to come out of his cell "for fear that CO. Banks will assault [plaintiff], set [plaintiff] up, or have [plaintiff] beaten by other officers." (*Id.*)

Plaintiff further alleges that he was assaulted by defendant Fisher on July 4, 2011. (*Id.* ¶ II–D, Ex. A "Fisher Grievance .") According to the Complaint, plaintiff approached defendant Fisher in his office regarding a problem with a disbursement form for plaintiff's legal mail. Upon bringing the problem to defendant Fisher's attention, plaintiff asserts that defendant Fisher became "very aggressive" and shouted expletives at plaintiff. (*Id.* Ex. A) As plaintiff attempted to leave defendant Fisher's office, Fisher allegedly pulled plaintiff back into the office and "repeatedly punched [plaintiff's] face until [plaintiff] was unconscious." (*Id.*) Plaintiff allegedly regained consciousness later in his cell "with swollen [sic] and bruised [sic] on [plaintiff's] face and body." (*Id.*) Plaintiff asserts that when he awoke, "Sergeant Fisher was shaking me awake and he spit on my face." (*Id.*) Defendant Fisher then allegedly handcuffed plaintiff and told plaintiff he was going to take him to the hospital. (*Id.*) Because plaintiff "couldn't barely walk at this point," plaintiff asserts that he "was literally dragged out the gallery," "thrown down the stairs," then dragged

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

"down 32 flights of stairs on [plaintiff's] back," at which point defendant Fisher took plaintiff to the hospital. (*Id.* ¶ II–D, Ex. A.) In addition to a swollen and bruised face, plaintiff claims he suffered "cervical and lumbar spinal injuries" and "was hospitalized for one month." (*Id.* ¶ III.)

**\*2** Plaintiff filed this Complaint on December 21, 2011, alleging that defendants' assaults violated the Eighth Amendment prohibition against cruel and unusual punishment. (Docket # 1.) Plaintiff seeks $2 million in compensatory and punitive damages. (Compl.¶ V.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555).

In considering a Rule 12(b)(6) motion to dismiss, all non-conclusory factual allegations are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's pro se pleadings, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F .3d 202, 214 (2d Cir.2008) (internal quotations omitted). The plaintiff's pleadings are thus given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed–Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal citation omitted).

In assessing the complaint, a court may consider documents incorporated by reference or attached to the complaint as exhibits, documents the plaintiff knew of or possessed and relied upon in framing the complaint, and items of which judicial notice maybe taken. *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993). Here,

plaintiff has attached relevant documents to the complaint, and these materials are properly considered on the motion.

## DISCUSSION

I. *Defendants' Motion to Dismiss All Claims Against Them in Their Official Capacities is Granted.*

Plaintiff sues the defendants in both their official and individual capacities. Absent a waiver or valid congressional override, the Eleventh Amendment has been construed to bar an action for damages by a private plaintiff against the state. *Seminole Tribe v. Florida,* 517 U.S. 44, 54 (1996). This immunity extends to state officials acting in their official capacity. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Section 1983 does not abrogate Eleventh Amendment immunity. *See Edelman v. Jordan,* 415 U.S. 651, 675–77 (1974). Damages are thus not recoverable in a section 1983 action against state officials acting in their official capacities. *See, e.g., Davis v. New York,* 316 F.3d 93, 101–02 (2d Cir.2002).

**\*3** Since plaintiff exclusively seeks monetary damages, not prospective injunctive relief, *see Ex Parte Young,* 209 U.S. 123 (1908), defendants' motion to dismiss all claims against them in their official capacities is granted. Eleventh Amendment immunity has no bearing on claims asserted against defendants in their individual capacities.

II. *Defendant Banks' Motion to Dismiss For Failure to State a Claim is Denied.*

Defendant Banks asserts that plaintiff has failed to state a claim for relief. There is no dispute that Banks was acting under color of state law at all times alleged in the complaint. Nor is it contested that the right to be free from excessive force is protected under the Eighth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.' ") (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1986)). Defendant Banks argues that plaintiff has failed to allege any injuries as a result of Banks' alleged conduct, and that plaintiff's allegations are thus insufficient to state an Eighth Amendment claim. Defendant Banks relies on *Johnson v. Glick* 481 F.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

1028, 1033 (2d. Cir.1973), for the proposition that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ...," violates the Constitution, and *Wilkins v. Gaddy,* 130 S.Ct. 1175, 1178 (2010), for the proposition that "not every malevolent touch by a prison guard gives rise to a federal cause of action."

Defendant Banks' reliance on these cases is misplaced. Plaintiff does not assert that defendant Banks "pushed" or "shoved" him. Rather, plaintiff alleges that defendant Banks "punched [plaintiff] in the stomach," causing plaintiff to "los[e][his] breath." (Compl.¶ II–D, Ex. B.) More significantly, the Supreme Court was clear in *Wilkins* that in assessing an Eighth Amendment claim, the " 'core judicial inquiry' ... was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Wilkins,* 130 S.Ct. at 1178 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)). As plaintiff alleges that the punch was not the result of "a good-faith effort to maintain or restore discipline," but rather a "willfully malicious" action, (Compl.¶ V), which resulted from defendant Banks "harrassing (sic)" him, (*Id.* ¶ II–D), the Court concludes that plaintiff has pled sufficient facts to state a claim of use of excessive force, for which Section 1983 provides a remedy. Defendant Banks' motion to dismiss on these grounds is therefore denied.

### III. *Defendant Banks' Motion to Dismiss on the Ground of Qualified Immunity is Denied.*

Defendant Banks asserts that he is protected by qualified immunity against any Section 1983 claims, because the alleged punch did not violate any clearly established federal law. Defendant Banks does not cite any relevant Eighth Amendment case law in support of this argument. Rather, he merely states that the alleged punch "caused no injuries and [was] de minimus," and thus "did not violate any clearly established federal law." (Def.Mem.7.)

**\*4** "The right of an individual not to be subjected to excessive force has long been clearly established." *Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989). As discussed in the preceding section, plaintiff does not allege de minimus use of force, and there is no

indication from the pleadings that force was necessary to maintain or restore discipline. An objectively reasonable corrections officer would have understood that punching an inmate in the stomach, for no purpose other than to harass him, would constitute excessive force in violation of the Eighth Amendment. *See Wilkins,* 130 S.Ct. at 1178. Plaintiff has thus sufficiently pled a violation of a clearly established federal right, and defendant Banks is not entitled to qualified immunity.

### IV. *Defendant Banks' Motion to Dismiss For Failure to Exhaust Under the PLRA is Converted to a Motion for Summary Judgment, and Denied.*

Defendant Banks asserts that plaintiff has failed to administratively exhaust his claim, as is required by the PLRA. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any ... correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Hill v. Curcione,* 657 F.3d 116, 124 (2d Cir.2011) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211 (2007).

In order to properly exhaust administrative remedies under the PLRA, inmates must complete the administrative review process in accordance with the rules of the particular institution in which they are confined. *Jones,* 549 U.S. at 218. In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has established a three-step inmate grievance procedure. This procedure is set forth in N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(2010).

First, an inmate must submit a grievance complaint to the clerk within twenty-one calendar days of an alleged occurrence. Id at (a). The Inmate Grievance Resolution Committee ("IGRC") then has up to sixteen calendar days to resolve the issue informally. *Id.* at (b)(1). If there is no informal resolution, the IGRC shall conduct a hearing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

within sixteen calendar days of receipt of the grievance, and issue a written decision within two working days of the close of the hearing. *Id.* at (b)(2). Next, an inmate must appeal an adverse decision to the facility superintendent within seven calendar days after receipt of the IGRC's written decision. *Id.* at (c)(1). The superintendent then has twenty days to render a decision. *Id.* at (c)(3). Finally, the inmate must appeal to the Central Office Review Committee ("CORC") within seven calendar days after receipt of the superintendent's written response, *id.* at (d)(1), and the CORC must render its final decision on the grievance within thirty calendar days from the time the appeal was received, *id.* at (d)(2). Only after an inmate has exhausted all three steps of this grievance process may he commence suit in federal court. *See Porter,* 534 U.S. at 524.

a. *Defendant Banks' Motion to Dismiss on Rule 12(b)(1) Grounds is Denied.*

**\*5** Defendant Banks seeks dismissal pursuant to Rule 12(b)(1) and (6), but fails to specify the precise Rule 12(b) grounds under which he seeks dismissal for failure to exhaust. As the PLRA's exhaustion requirement is not jurisdictional in nature, *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003), the Court cannot dismiss plaintiff's action for lack of subject matter jurisdiction. Thus, to the extent that the motion at bar is brought pursuant to Rule 12(b)(1), it is denied.

b. *Defendant Banks' Motion to Dismiss on Rule 12(b)(6) Grounds is Converted To a Motion for Summary Judgment.*

Defendant Banks also seeks dismissal for failure to exhaust pursuant to Rule 12(b)(6). Failure to exhaust is an affirmative defense under the PLRA and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Dismissal pursuant to Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint. *See McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003) (Chin, J.). Here, plaintiff states in the Complaint that he filed a grievance with Sing Sing's grievance office, and that his claims were denied. (Compl.¶ IV.) Plaintiff further states he

appealed to the superintendent Philip D. Heath and [his] appeal was denied. [He] then appealed to Albany N.Y. CORC and received a letter from them dated November 2nd 2011 claiming they would look into the matter. However as of today [he] ha[sn't] heard back from CORC.

(Compl.¶ IV–E(3).) Nonexhaustion is thus not apparent from the face of the complaint, and dismissal pursuant to Rule 12(b)(6) is inappropriate.

However, as then-District Court Judge Chin has noted,

If nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 12(b) [now codified in relevant part as Rule 12(d) ], to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.

*McCoy,* 255 F.Supp.2d at 251. Under Rule 12(d), Fed.R.Civ.P., if "matters outside the pleadings are presented to and not excluded by the court" on a motion under Rule 12(b)(6), "the motion must be treated as one for summary judgment under Rule 56." Moreover, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* Accordingly, "a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings," so long as "the court give [s] 'sufficient notice to an opposing party and an opportunity for that party to respond.' " *Hernandez v. Coffey,* 582 F.3d 303, 307 (2d Cir.2009) (quoting *Groden v. Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir.1995)).

**\*6** In *Hernandez v. Coffey,* the Second Circuit expounded on the notice requirement with regards to *pro se* parties. *Hernandez,* 582 F.3d at 307–09. The court began by noting that formal notice is not ordinarily required "where a party 'should reasonably have

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Id.* at 307 (alteration in original) (quoting *Villante v. Dep't of Corrections of City of New York,* 786 F.2d 516, 521 (2d Cir.1986)). However, in the case of a pro se party, " '[n]otice is particularly important' because the *pro se* litigant 'may be unaware of the consequences of his failure to offer evidence bearing on triable issues.' " *Id.* (alteration in original) (quoting *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983)). Accordingly, the court ruled that "absent a clear indication that the *pro se* litigant understands the nature and consequences of Rule 56 ... he or she must be so informed by the movant in the notice of motion or, failing that, by the district court." Id at 308 (citing *McPherson v. Coombe,* 174 F.3d 276 (2d Cir.1999)).

Here, defendant Banks provided to plaintiff precisely the kind of notice required by *Hernandez.* In accordance with S.D.N.Y. Civil Rules 12.1 and 56.2, defendant Banks served plaintiff with notice that the motion to dismiss might be converted to a summary judgment motion, explaining to plaintiff what he had to do to oppose summary judgment. ("Notice to Pro Se Litigants Opposing Motion to Dismiss or Motion for Summary Judgment," dated March 26, 2012, Docket # 19.) *See Hernandez,* 582 F.3d at 309 n. 2 (in reversing the district court, noting that two cases relied upon by the district court were "inapposite because the defendants in each case provided notice pursuant to S.D.N.Y. Civil Rule 12.1 explaining that their motions to dismiss might be converted into motions for summary judgment for purposes of determining exhaustion, and, further, explaining what the plaintiff had to do to oppose summary judgment"). Accordingly, the Court concludes that converting the motion to dismiss to a motion for summary judgment is appropriate.

c. *Defendant Banks' Motion for Summary Judgment is Denied.*

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed.R.Civ.P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012).

"[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Svcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d. Cir.1994). In response, the nonmovant bears only a "limited burden of production," *Powell v Nat'l Bd. of Medical Examiners,* 364 F.3d 79, 84 (2d Cir.2004), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought," *Gallo,* 22 F.3d at 1223. Moreover, the Second Circuit has "long recognized that summary judgment is a drastic device," *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n. Inc.,* 182 F.3d 157, 160 (2d Cir.1999), and "should not be granted when there are major factual contentions in dispute," *National Life Ins. Co. v. Solomon,* 529 F.2d 59, 61 (2d Cir.1975). "This is particularly so when, as here, one party has yet to exercise its opportunities for pretrial discovery." *Id.*

**\*7** Nonetheless, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (internal quotations omitted). If the evidence produced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

Here, there is a disputed issue of material fact as to whether plaintiff administratively exhausted his remedies. Defendant Banks has submitted evidence concerning the CORC computer database, which allegedly "contains a great deal of historical data with respect to appeals to CORC." (Bellamy Decl. ¶ 4, annexed to Harben Decl.) Defendant Banks submits that this database reveals that CORC never received any grievance appeals from plaintiff with respect to the incident at issue. However, plaintiff has declared under penalty of perjury: that he filed a grievance against defendant Banks, and that Sing Sing's Inmate Grievance Committee failed to respond; that he then

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 5278543 (S.D.N.Y.)

(Cite as: 2012 WL 5278543 (S.D.N.Y.))

appealed his grievance to the superintendant, and that the superintendant similarly failed to respond; and that he appealed to CORC, and was told that there was no record of his grievance. ("Opposition in Response to Defendants Motion to Dismiss" ¶ 1, Docket # 24; "Affidavit of Hector Laporte," Docket # 27.) This evidence, viewed in the light most favorable to the nonmoving party, raises a genuine dispute of material fact. Therefore, and particularly in light of the fact that plaintiff has "yet to exercise [his] opportunit[y] for pretrial discovery," *Solomon,* 529 F.2d at 61, summary judgment is denied. Defendant Banks is free to renew his motion for summary judgment at the close of discovery. If after a full and fair opportunity to conduct discovery, all that plaintiff is able to present is a conclusory assertion, unsupported by documentary evidence (where one would expect documentary support to exist), the defense of lack of exhaustion may look quite different.

## CONCLUSION

For the foregoing reasons and to the extent stated above, the defendants' motion to dismiss is GRANTED in part and DENIED in part. All claims against defendants Banks and Fisher in their official capacities are dismissed. All other claims, including all claims against the defendants in their individual capacities, remain pending.

The defendants shall provide to the plaintiff copies of all unreported cases cited herein. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

S.D.N.Y.,2012.

Laporte v. Fisher
Slip Copy, 2012 WL 5278543 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at \*3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007)* (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." )* [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at \*4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm-had* inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

*12 Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained in Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

> FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

**\*14** (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

> FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

> FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

> FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims. [FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See* *Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be **GRANTED** **in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and **DENIED in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the

remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis FLANAGAN, Plaintiff,
v.
J. MALY, Captain at Downstate Corr. Fac., A. Sedlak,
Sergeant at Downstate Corr. Fac., P. Artuz, Corr.
Officer at Downstate Corr. Fac ., S. KIERNAN, Corr.
Officer at Downstate Corr. Fac., J. Whalen, Corr.
Officer at Downstate Corr. Fac., D. Alfonso, Corr.
Officer at Downstate Corr. Fac., Individually and in
their Official Capacity, Defendants.
**No. 99 CIV 12336 GEL.**

Jan. 29, 2002.

Dennis Flanagan, for Plaintiff Dennis Flanagan, pro se.

Eliot Spitzer, Attorney General of the State of New York
(Melinda Chester-Spitzer, Assistant Attorney General of
the State of New York,), for Defendants J. Maly, A.
Sedlak, P. Artuz, S. Kiernan, J. Whalen, D. Alfonso, of
counsel.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Dennis Flanagan, a New York State prisoner, brings
this action against a number of corrections officers at
Downstate Correctional Facility, where he was formerly
incarcerated, charging that they violated his constitutional
rights. Specifically, he alleges that all the defendants
except John Maly used excessive force against him in an
altercation on June 4, 1999; that Maly, who conducted a
disciplinary hearing on charges brought against Flanagan
as a result of that incident, denied him due process of law;
and that the defendants collectively denied him access to

medical care and to the law library. Defendants move for
dismissal of the complaint and/or summary judgment, on
a variety of grounds. The motion is granted in substantial
part as to all claims except the excessive force claim, as to
which proceedings will be stayed pending the Supreme
Court's decision in *Porter v. Nussle,* 122 S.Ct. 455 (2001).

The facts underlying plaintiff's claims will be addressed,
to the extent necessary, in the discussion of the defendants'
various arguments.

*DISCUSSION*

I. *Exhaustion of Administrative Remedies*

Defendants argue that the entire complaint should be
dismissed for failure to exhaust available administrative
remedies as required by 42 U.S.C. § 1997a(e), which
provides:

No action shall be brought with respect to prison
conditions under section 1983 of this title, or any other
Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative
remedies as are available have been exhausted.

A. *Medical and Legal Needs*

Unquestionably, Flanagan's claims about inadequate
access to medical care and legal materials are complaints
about "prison conditions" within the meaning of this
statute. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435,
439-440 (S.D.N.Y.2000) (deliberate indifference to
medical needs and access to courts are "prison
conditions"); *Cruz v. Jordan,* 80 F.Supp.2d 109
(S.D.N.Y.1999) (deliberate indifference to medical needs
are "prison conditions"); *Carter v. Kiernan,* 2000 WL
760303 (S.D.N .Y. June 12, 2000) (same). Equally
unquestionably, Flanagan has failed to exhaust available
administrative remedies with respect to those claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

New York permits inmates to file internal grievances as to virtually any issue affecting their confinement. *See* N.Y. Corr. Law § 139 (authorizing inmate grievances); 7 N.Y.C.R.R. § 701.7 (establishing procedures for processing such grievances); *Petit v. Bender* 2000 U.S. Dist LEXIS 3536 at *6-8 (S.D.N.Y. March 22, 2000) (describing procedures); *Vasquez v. Artuz,* 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (same).

Prison records show no written grievances filed by Flanagan with respect to his medical or legal access. (Hughes Aff. Ex. BB at 4 ¶ 13.) Flanagan essentially concedes that he filed no such written grievance.[FN1] He does contend that he made an oral complaint to both the area supervisor, Sergeant Sedlak, (Pl.'s Br. at 3 ¶ 10), and a grievance supervisor, Skip Hughes -contentions which both officers deny (Sedlak Aff. Ex. G at 7 ¶ 26; Hughes Aff. Ex. BB at 4 ¶ 17).

> FN1. Flanagan states under oath that he submitted a "verbal grievance" to Sergeant Sedlak and "another verbal grievance" to supervisor Hughes who "ignored" his complaint. (Flanagan Aff. ¶¶ 3-4; Pl.'s Br. 1.) Although Flanagan's brief opposing summary judgment later states that "plaintiff did file a written grievance," the remainder of the same sentence suggests that he unintentionally omitted the word "not," as plaintiff proceeds to explain why an oral grievance should be considered the equivalent of a written grievance. (Pl.'s Br. 8.) Evaluating this in conjunction with Flanagan's affidavit, which nowhere states that he made a written complaint, it is clear that Flanagan is not claiming to have made a written report.

**\*2** But even if Flanagan made oral complaints or filed a written report of some kind, that would not satisfy the statutory requirement. To comply with 1997(e), a prisoner must "exhaust[ ]" his administrative remedies, meaning that he must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit. *Sonds v. St. Barnabas Hosp. Corr. Health Serve.,* 2001 U.S. Dist. LEXIS 7839 at *4 (S.D.N.Y. May 21, 2001); *Santiago,* 89 F.Supp.2d at 438, 438. The New York procedures provide for several levels of administrative review, beginning with

the filing of a written grievance, 7 N.Y.C.R.R. § 701.7(a)(1), and continuing through several levels of administrative appeal, 7 N.Y.C.R.R. § 701.7(a)(4), (b), and (c). The record demonstrates that Flanagan was fully aware of the availability of these grievance procedures. They are described in a booklet provided to all inmates on arrival, (Defs.' Br. 15), and Flanagan himself filed grievances over other issues.[FN2] Flanagan does not claim, let alone provide any evidence, that he pursued his grievance through these channels. [FN3]

> FN2. Prison records indicate that Flanagan filed a written grievance regarding the prison food served in the Downstate Correctional Facility. (Hughes Aff. Ex. BB at 4 ¶¶ 13, 17; Ex. CC.)

> FN3. As previously stated, Flanagan claims that he submitted only verbal grievances to complaint supervisor Hughes and defendant Sedlak, who reacted with hostility to the complaint and threatened plaintiff with violence if he continued to complain. (Pl.'s Br. at 1, 6, 8-9; Flanagan Aff. ¶ 3.) No doubt, under some circumstances, behavior by prison officials that prevented a prisoner from complying with § 1997a(e) would excuse compliance. But Flanagan alleges nothing approaching conduct that would present this issue. He evidently made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance.

Accordingly, Flanagan's claims of deliberate indifference to his medical needs and denial of access to the law library must be dismissed for failure to exhaust administrative remedies.

B. *Due Process*

Flanagan's due process claim, in contrast, cannot be so easily dismissed on exhaustion grounds. Flanagan argues that in conducting his disciplinary hearing, which resulted in a sentence of 24 months in Special Housing and various other administrative sanctions, Maly denied him due process by denying him the right to call a witness and to

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

introduce certain medical records. Flanagan appealed this decision internally, to no avail. (Spitzer Decl. Ex. X.)

To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

Defendants essentially concede as much. Although their brief asserts that Flanagan's entire "action" should be dismissed for failure to exhaust (Defs.' Br. 13), the brief goes on to argue extensively for such dismissal of the medical and legal access claims (*id.* 14-16), and of the excessive force claim (*id.* 16-21), without directing any argument toward the exhaustion of the due process claim.[FN4]

FN4. The exhaustion rule does require a plaintiff to have appealed his disciplinary case to the fullest extent provided by administrative regulations. *Sonds,* 2001 U.S. Dist. LEXIS 7830 at *4. It is not entirely clear on this record that Flanagan did. Given that (1) it is clear that Flanagan unsuccessfully pursued some appeal of the result of his hearing, (2) defendants have not pointed out any further levels of appeal available to him that he failed to utilize, and (3) the due process claim must be dismissed on the merits in any event, there is no need to pursue further clarification of the matter.

**\*3** For these reasons, the motion to dismiss the due process claim for failure to exhaust administrative remedies must be denied.[FN5]

FN5. Flanagan's complaint, construed liberally as pro se pleadings must be, also appears to claim that certain defendants conspired to file false reports against him. (Compl.¶¶ 21-22.) Defendants do not address an exhaustion argument specifically to this claim. Arguably, the same logic set out above as to the due process claim would permit the conclusion that, by contesting the reports at his hearing and exhausting his appeals, Flanagan has exhausted his remedies as to this claim as well. Assuming without deciding that the exhaustion requirement has been met, this claim must nevertheless be dismissed for failure to state a claim, since a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986); *see also Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997), and there is no claim here that the false report constituted retaliation for exercise of a constitutional right, rather than simply a rationalization for the use of allegedly excessive force. *Cf. Franco v. Kelly* 854 F.2d 584, 588 (2d Cir.1988).

C. *Excessive Force*

Flanagan's excessive force claim also survives the defendants' exhaustion argument. The claim that individual officers assaulted an inmate on a particular occasion does not fit easily within the ordinary meaning of "[an] action ... with respect to prison conditions," and the Second Circuit has ruled that such a complaint is not subject to the exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000).

Defendants structure much of their argument against the excessive force claim as an attack on the Second Circuit's decision in *Nussle,* recommending that this Court, in effect, overrule *Nussle* from below. Defendants' arguments that *Nussle* was wrongly decided are appropriately addressed only to higher authority - and have been. The Supreme Court has granted certiorari in *Nussle, Porter v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

*Nussle,* 122 S.Ct. 455 (2001).[FN6] While that Court's recent decision in *Booth v. Churner,* 121 S.Ct. 1819 (2001), suggests that the Court might reverse, until and unless it does, *Nussle* remains the law of this circuit, and requires denial of defendants' motion to dismiss the excessive force claim.

> FN6. Indeed, New York's Attorney General has himself presented his arguments for reversal of *Nussle* in an amicus brief in that case. *See* Brief of Amici Curiae New York, *et al., Porter v. Nussle* (No. 00-853), 122 S.Ct. 455 (2001).

II. *Summary Judgment*

Defendant Maly moves in the alternative for summary judgment on Flanagan's due process claim. That motion will be granted.

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (internal

citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252).

**\*4** It is settled that the "[p]rocedures established by the New York Department of Correctional Services governing disciplinary hearings comport with the due process procedural rights to which prison inmates are entitled." *Rodriguez v. Ghoslaw,* 2001 WL 755398 at *9 (S.D.N.Y. July 5, 2001), citing *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Flanagan nevertheless claims that Maly deprived him of due process by evidentiary rulings made during the hearing.

The facts relating to these claims are essentially undisputed, and on those facts no denial of due process can be found. Flanagan offers no evidence to dispute Maly's testimony that the witness Flanagan sought to call, an inmate named Sanabria, refused to testify at the hearing. (Spitzer Decl. Ex. U at 24.) Indeed, upon learning that Sanabria would not appear at the hearing, Maly went to Sanabria's cell to inquire further, and Sanabria again refused.[FN7] (*Id.* at 25; Spitzer Decl. Ex. V at 19.) It is thus not true that Maly precluded a relevant witness from testifying.

> FN7. Sanabria told Maly he would not testify because he had been threatened by a corrections officer named Lee. There is, of course, no admissible evidence that this was so, Sanabria's statement being hearsay. But even if such a threat had occurred, nothing in the record casts doubt on Maly's testimony that he reassured Sanabria that his safety would be guaranteed if he testified, as three other inmates, including Flanagan, did. (Maly Aff. Ex. U at ¶¶ 25-26.)

As for the documentary evidence, Maly refused to admit photographs taken of Flanagan on the date of the incident, which Flanagan asserted would show that his hands were not bruised, arguably tending to show that he had not assaulted a corrections officer as charged. Maly ruled the photos irrelevant. The photographs were of limited

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

probative value, and while the better course might have been to admit them, it can hardly be said that their exclusion was prejudicial error, let alone that it rises to the level of a denial of due process.

Maly heard testimony from Flanagan and two inmate witnesses, as well as from three corrections officers and the nurse who treated Flanagan and the officers after the fight. He also reviewed various medical records. The hearing provided Flanagan an opportunity to be heard "at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976), and thus comported with the requirements of due process. At a minimum, Maly is entitled to qualified immunity against Flanagan's claims, since his conduct of the hearing did not violate any "clearly established statutory or constitutional right," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989), as established by Supreme Court or Second Circuit precedent, *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

Accordingly, Maly's motion for summary judgment must be granted.

III. *Stay of Proceedings*

Defendants do not seek summary judgment on the one remaining claim, for the alleged use of excessive force. Nor could they successfully do so, since the parties' conflicting testimony as to the events precipitating the use of force and the degree of force used presents classic questions of fact for jury resolution.[FN8] Accordingly, Flanagan's excessive force claim can proceed to trial.

> FN8. The only one of defendants' remaining arguments that applies to this claim is their weakly-presented contention that the Court lacks jurisdiction under the Eleventh Amendment to the extent that they are sued in their official capacities. (Defs.' Br. at 39-40.) However, according Flanagan's complaint the liberal construction to which he is entitled, it is clear that he means to assert an ordinary claim that defendants as individuals violated his rights

under color of state law.

It would be imprudent, however, to schedule a trial at this time, in view of the pending Supreme Court decision in *Nussle.* Oral argument has already been heard, and a decision is likely within a few months. If the Supreme Court reverses and holds that exhaustion of administrative remedies is required in excessive force cases, Flanagan's one remaining claim will have to be dismissed, and any additional proceedings in this matter will have been wasted. If the Court affirms, in contrast, neither party will have been prejudiced by a brief delay. Therefore, proceedings in this case will be stayed pending the Supreme Court's decision.

*CONCLUSION*

**\*5** For the reasons set forth above, plaintiff's claim that defendants deprived him of access to medical care and to the courts are dismissed for failure to exhaust administrative remedies. Plaintiff's claim that defendants conspired to file false disciplinary reports is dismissed for failure to state a claim on which relief can be granted. Summary judgment for defendant Maly is granted on plaintiff's claim that he was denied due process of law at his disciplinary hearing; since this is the only claim against Maly, the case is terminated as to him.

The remaining defendants' motions to dismiss or for summary judgment with respect to plaintiff's claim of excessive force are denied, and further proceedings on that claim are stayed pending the Supreme Court's decision in *Porter v. Nussle.*

SO ORDERED:

S.D.N.Y.,2002.
Flanagan v. Maly
Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

⚑

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.

Salih KHALID, _____ Plaintiff,
_____
v.
Correctional Officer F. REDA, Lt. Farrell,
_____
Defendants.
No. 00Civ.7691(LAK)(GWG).

Jan. 23, 2003.

Inmate brought pro se § 1983 action against corrections officer, alleging violations of Eighth, Ninth, and Fourteenth Amendments. Officer moved to dismiss. The District Court, Gorenstein, United States Magistrate Judge, recommended that: (1) inmate did not exhaust available administrative remedies in due process claim; (2) any cruel and unusual punishment arising out of alleged forgery of documents was not raised in a grievance; (3) continued confinement in special housing unit (SHU) did not constitute cruel and unusual punishment; (4) Ninth Amendment claim was dismissed pursuant to Prison Litigation Reform Act (PLRA); and (5) dismissal of Ninth Amendment claim was required even if administrative remedies had been exhausted.

Dismissal recommended.

West Headnotes

**[1] Civil Rights 78 ⬩ 1311**

78 Civil Rights
    78III Federal Remedies in General
       78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
          78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases

(Formerly 78k194)
Inmate did not exhaust available administrative remedies, in his § 1983 claim that he was denied due process because his disciplinary hearing commenced two days later than allowed by statute, and therefore dismissal of action pursuant to Prison Litigation Reform Act (PLRA) was required; inmate did not file any grievance relating to his due process claim inasmuch as he appealed the disposition of the disciplinary hearing on unrelated grounds. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §§ 1983, 1997e(a); 7 NYCRR 251-5.1(a).

**[2] Civil Rights 78 ⬩ 1311**

78 Civil Rights
    78III Federal Remedies in General
       78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
          78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases

(Formerly 78k194)
Inmate did not exhaust available administrative remedies, in his § 1983 claim that corrections official's alleged forgery of request for extension of time for inmate's disciplinary hearing resulted in inmate's continued confinement in special housing unit, constituting cruel and unusual punishment, and therefore dismissal of action pursuant to Prison Litigation Reform Act (PLRA) was required; inmate did not file any grievance relating to claim. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §§ 1983, 1997e(a); 7 NYCRR 701.2(a).

**[3] Prisons 310 ⬩ 230**

310 Prisons
    310II Prisoners and Inmates
       310II(E) Place or Mode of Confinement
          310k229 Punitive, Disciplinary, or Administrative Confinement
            310k230 k. In General. Most Cited Cases
(Formerly 310k13(5))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

**Sentencing and Punishment 350H** ☜ **1553**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General
    350HVII(H) Conditions of Confinement
        350Hk1553 k. Segregated or Solitary
Confinement. Most Cited Cases

    Even if inmate did not exhaust his available administrative remedies, in his § 1983 claim that corrections official's alleged forgery of request for extension of time for inmate's disciplinary hearing resulted in inmate's continued confinement in special housing unit (SHU), no Eighth Amendment violation occurred; deprivation of being housed in SHU was not so serious as to constitute cruel and unusual punishment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983; 7 NYCRR 701.2(a).

**[4] Civil Rights 78** ☜ **1311**

78 Civil Rights

    78III Federal Remedies in General
    78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
        78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases
    (Formerly 78k194)

    Inmate's claim in § 1983 action, that corrections official's alleged forgery of request for extension of time for inmate's disciplinary hearing, was dismissed pursuant to Prison Litigation Reform Act (PLRA); claim was not raised on appeal from disciplinary hearing and inmate did not present claim as part of a grievance. U.S.C.A. Const.Amend. 9; 42 U.S.C.A. §§ 1983, 1997e(a).

**[5] Civil Rights 78** ☜ **1092**

78 Civil Rights

    78I Rights Protected and Discrimination Prohibited in General
    78k1089 Prisons
        78k1092 k. Discipline and Classification; Grievances. Most Cited Cases

(Formerly 78k135)

    Even if administrative remedies had been exhausted for inmate's claim in § 1983 action, that corrections official's alleged forgery of request for extension of time for inmate's disciplinary hearing constituted a Ninth Amendment violation, dismissal of claim was required; Ninth Amendment referred only to unenumerated rights and so could not serve as basis for a § 1983 action. U.S.C.A. Const.Amend. 9; 42 U.S.C.A. § 1983.

*ORDER*

KAPLAN, District Judge.

    **\*1** The motion of defendant Farrell to dismiss the complaint is granted for the reasons set forth in the Report and Recommendation of Magistrate Judge Gorenstein to which no object has been filed. As this disposes of the last claims against the last defendant, the Clerk shall entire final judgment and close the case.

    SO ORDERED.

*REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.

    Salih Khalid filed this action *pro se* on October 12, 2000, asserting claims under 42 U.S.C. § 1983. On November 27, 2000, he filed an amended complaint naming two defendants: Lieutenant Farrell and Officer Reda. Summary judgment has already been granted in favor of Officer Reda. *See Khalid v. Reda,* 2002 WL 31133086 (S.D.N.Y. Sept.24, 2002) (adopting 2002 WL 31014827 (S.D.N.Y. Sept.10, 2002) (Report and Recommendation)). Farrell now moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Khalid has not opposed this motion. For the following reasons, Farrell's motion should be granted and the action dismissed.

I. *BACKGROUND*

_____ A. *Facts*

    _____ The facts as set forth in the complaint and documents attached thereto are assumed for purposes of this motion to be true.

    Khalid was involved in an altercation with another

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

inmate on September 26, 1999. Amended Complaint, filed November 27, 2000 ("Complaint"), ¶ 1. Subsequent to this altercation, which Officer Reda witnessed, Khalid was confined to a special housing unit ("SHU") pending a Tier III disciplinary hearing. *Id.,* ¶¶ 2, 5–6. Lieutenant Farrell was designated to conduct this hearing, which prison regulations required be held by October 2, 1999. *Id.,* ¶¶ 5, 7; *see* Sing Sing Correctional Facility Memorandum, dated September 27, 1999 (Complaint, Ex. B); *see also* 7 N.Y.C.R.R. § 251–5.1(a) (disciplinary hearing to commence within seven days of confinement unless commissioner grants extension). Prior to the hearing date, Khalid requested that Corrections Officer Azhan attend the hearing to serve as an Arabic interpreter. *See* Inmate Request Form, dated September 28, 1999 (Complaint, Ex. C). The day before the scheduled hearing Farrell issued a memorandum requesting an extension of time until October 5, 1999 to conduct the hearing due to the unavailability of Azhan and an "[e]mployee witness," both of whom were expected to return on that date. Disciplinary Hearing Extension Request, dated October 1, 1999 ("Extension Request Form") (Complaint, Ex. D), at 1–2. The request was granted. *Id.* at 2. The hearing in fact was held on October 4, 1999—the day before the extended date. *See* Transcript of Hearing, dated October 4, 1999 (Complaint, Ex. E).

On October 4, 1999, Khalid pled guilty to fighting and was adjudged guilty of creating a disturbance and assault on an inmate. Disposition, dated October 4, 1999 (annexed to Complaint, Ex. G), at 1–2. As punishment, Farrell ordered Khalid confined to the SHU for thirty-six months with loss of packages, commissary and telephone privileges and recommended a loss of six months good time credit. *Id.* at 1. On October 15, 1999, Khalid appealed the determination on due process grounds, alleging that i) the decision was not based on substantial evidence; ii) he was denied a proper interpreter; and iii) he was given an inaudible tape of the hearing. Appeal Form to Commissioner, Superintendent's Hearing, dated October 15, 1999 ("Appeal of Hearing") (reproduced in Declaration of Benjamin Lee, dated October 14, 2002 ("Lee Decl."), Ex. A), at 3–7. Khalid submitted a supplemental appeal on October 28, 1999, in which he also alleged that Farrell had not been impartial. *See* Supplement [sic] Appeal, dated October 24, 1999

("Supp.Appeal") (reproduced in Lee Decl., Ex. A), at 1–5.[FN1]

> FN1. The appeal documents filed by Khalid are being considered on this motion to dismiss because Khalid makes specific reference to his appeal of the disciplinary hearing in the complaint. *See* Complaint, ¶ XI; Ex. H. Having not responded to the motion to dismiss, Khalid has not disputed the authenticity of these documents.

**\*2** The disposition was eventually modified to nine months SHU and a corresponding nine month loss of privileges, but there was no change in the original loss of good time credit. *See* Review of Superintendent's Hearing, dated December 7, 1999 (annexed to Complaint, Ex. H), at 1–2. Khalid later filed an Article 78 proceeding in New York Supreme Court challenging the disciplinary proceeding and penalty, which was transferred to the Appellate Division, Third Department and dismissed by order dated June 7, 2001. *See* Memorandum and Judgment, dated June 7, 2001 (reproduced in Lee Decl., Ex. B). The court found that Khalid's plea of guilty to the charge of fighting barred him from challenging the sufficiency of the evidence on that charge. *Id.* at 1. As for the remaining charges, the court found there was substantial evidence to support the finding of guilt. *Id.* at 1–2. It also ruled that the gaps in the transcription of the hearing tape were not "so significant as to preclude meaningful review." *Id.* at 2. It found Khalid's other arguments, which were not identified, unpreserved and without merit. *Id.*

**B.** *Khalid's Claims and the Current Motion*

On November 27, 2000, Khalid filed the amended complaint in this action, which alleges that Farrell violated his rights under the Eighth, Ninth and Fourteenth Amendments. Specifically, Khalid argues that Farrell did not know on October 1, 1999—the day Farrell requested the extension—that Khalid intended to call Reda (presumably the "employee witness" listed on the Extension Request Form) to testify at the hearing. Complaint, ¶¶ 8 n. 1, 12; *see* Extension Request Form at 1. Rather, Khalid claims he made the request at the

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

October 4, 1999 hearing itself. Complaint, ¶ 8. The import of this allegation appears to be that Farrell had no basis to postpone the hearing from October 1 to October 4. *See* Complaint, ¶ 8 n. 1. Thus, Khalid asserts that Farrell "forged documents by requesting an extension" of time in which to conduct the disciplinary hearing and that this resulted in the unlawful continuation of his confinement in the SHU. *See* Complaint, ¶¶ 12, 16–17. Khalid seeks "$100 dollars for each day in Special Housing as a result of the illegally conducted Tier III/Expungment [sic] from the Plaintiff's institutional records and any mention of this incident." *Id.,* § V.

Proceedings against Farrell were stayed pursuant to the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. app. § 521. On October 15, 2002, after his return to civilian status, Farrell filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b). As noted above, Khalid has declined to oppose this motion, which is currently before the Court.

## II. *DISCUSSION*

### A. *Standard of Review*

The standard of review on a motion to dismiss under Fed.R.Civ.P. 12(b)(1) or 12(b)(6) is identical. *See Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999) (citation omitted). "[O]n a motion to dismiss a court must accept all factual allegations as true and draw all inferences in the plaintiff's favor ." *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001) (citing *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994)), *cert. denied,* 122 S.Ct. 1911 (2002). It is well settled that "dismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief." *Id.* (citing *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)); *accord Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his or her claims. *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). In deciding a motion to dismiss under Fed.R.Civ.P. 12(b) the Court must "confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated

in the complaint by reference, and to matters of which judicial notice may be taken." ' *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *accord Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). Further, courts are cautioned to interpret the pleadings liberally when considering motions to dismiss the claims of a *pro se* plaintiff, particularly those alleging civil rights violations. *See, e.g., Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001); *Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999).

### B. *Section 1983 Claims*

**\*3** Khalid brings the instant action under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In order to bring a claim under section 1983 the plaintiff "must allege (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Dwyer v. Regan,* 777 F.2d 825, 828 (2d Cir.1985), *modified on other grounds,* 793 F.2d 457 (2d Cir.1986); *accord Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). "It is familiar law that § 1983 does not create substantive rights, but simply provides the procedural mechanism through which a plaintiff may bring a suit for violation of a federal right." *Bruneau ex rel. Schofield v. South Kortright Cent. School Dist.,* 163 F.3d 749, 756 (2d Cir.1998), *cert. denied,* 526 U.S. 1145, 119 S.Ct. 2020, 143 L.Ed.2d 1032 (1999). Thus, the plaintiff must demonstrate a violation of an independent federal constitutional or statutory right. *See, e.g., Chapman v. Houston Welfare Rights Org.,* 441

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

U.S. 600, 617–18, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

Here, Khalid claims violation of his rights under the Eighth, Ninth and Fourteenth Amendments. The defendant does not dispute that he was acting under color of state law.

C. *Exhaustion*

Under the Prison Litigation Reform Act ("PLRA"), 110 Stat. 1321–73, as amended, 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This means the prisoner "must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit." *Flanagan v. Maly,* 2002 WL 122921, at *2 (S.D.N.Y. Jan.29, 2002); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ( "[a]ll 'available' remedies must now be exhausted"). The Supreme Court has made clear that "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Nussle,* 534 U.S. at 532.[FN2]

> FN2. Khalid filed the present action before *Nussle* was decided. However, "the broad exhaustion requirement announced in *Nussle* applies with full force" to litigants in such a situation. *Espinal v. Goord,* 2002 WL 1585549, at *2 n. 3 (S.D.N.Y. July 17, 2002); *see generally Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.").

In New York, 7 N.Y.C.R.R. § 701 outlines the Inmate Grievance Program ("IGP") under which prison inmates may file grievances. "[T]he grievance must contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." 7 N.Y.C.R.R. § 701.7(a)(1)(i). Once the complaint is filed with the Inmate Grievance Resolution Committee ("IGRC"), "(1) the grievance is investigated and reviewed by the IGRC; (2) if appealed, the Superintendent of the facility reviews the IGRC's determination; and (3) if the superintendent's decision is appealed, the [Central Office Review Committee] makes the final administrative determination." *Saunders v. Goord,* 2002 WL 31159109, at *3 (S.D.N.Y. Sept.27, 2002); *see* 7 N.Y.C.R.R. § 701.7(a)-(c). An inmate has not exhausted his administrative remedies "until he goes through all three levels of the grievance procedure." *Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002).

1. *Fourteenth Amendment Due Process Claim*

**\*4** Khalid concedes that he has not filed any grievance relating to the instant claim, let alone fully exhausted his administrative remedies pursuant to the IGP. *See* Complaint, § II.B. He suggests, however, that his failure to exhaust should be excused because "Tier III's cannot be decided by IGRC." *Id.,* § II.D. Construing his complaint broadly, Khalid may be arguing that resort to the IGP is unnecessary where an inmate files a direct appeal challenging a disciplinary hearing. Because he filed such an appeal, *see* Appeal of Hearing, at 1–7; *see also* Supp. Appeal, at 1–5, the argument would be that no additional exhaustion is required.

There is support for such an argument. In *Flanagan,* the plaintiff brought an action alleging, *inter alia,* denial of medical and legal needs and violations of due process during his disciplinary hearing. 2002 WL 122921, at *1. On defendant's motion to dismiss, the court found the plaintiff had not exhausted all his administrative remedies with respect to the denial of medical and legal needs because he failed to utilize the IGP. *Id.* at *1–*2. Accordingly, these claims were dismissed. *Id.* at *2. With respect to the due process claim, however, the court held that utilization of the grievance process was unnecessary:

> To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997e(a), by giving the state an opportunity to correct any errors and avoiding premature litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Id.* at *2. At least one subsequent decision has adopted *Flanagan'* s reasoning. *See Samuels v. Selsky,* 2002 WL 31040370, at *8 (S.D.N.Y. Sept.12, 2002) ("Disputes stemming from a disciplinary hearing are properly appealed directly and not through the [IGP].").

This doctrine, however, does not help Khalid. Putting aside the issue of whether Khalid has appealed his disciplinary hearing to the "highest level of the state correctional department," *see Flanagan,* 2002 WL 122921, at *2, the prisoner at a minimum must exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). New York law recognizes that an appeal of a disciplinary hearing requires, for preservation purposes, that the inmate raise the particular objections he has to the disciplinary hearing either during the hearing itself or on appeal. *See, e.g., Tavarez v. Goord,* 237 A.D.2d 837, 838, 655 N.Y.S.2d 189 (3d Dep't 1997). *Flanagan* too contemplates that the prisoner alleging due process violations must "*present[ ] his objections* in the administrative appeals process ." 2002 WL 122921, at *2 (emphasis added); *see Samuels,* 2002 WL 31040370, at *8 ("the underlying point [of *Flanagan* is] that issues directly tied to the disciplinary hearing *which have been directly appealed* need not be appealed again collaterally through the [IGP]") (emphasis added).

**\*5** Here, however, Khalid's administrative appeal did not raise or even allude to his current claim—that is, that his due process rights were violated at the hearing because

it commenced two days later than allowed by 7 N.Y.C.R.R. § 251–5.1(a). Instead, he appealed the disposition of the disciplinary hearing on unrelated grounds. *See* Appeal of Hearing, at 3–7 (claiming lack of substantial evidence; that he was denied a proper interpreter; and that he was given an inaudible tape of the hearing); *see also* Supp. Appeal, at 1–5 (claiming additionally that Farrell was not impartial). Thus, the prison administration was denied the opportunity to address Khalid's claims in this case—the touchstone of exhaustion. As the Supreme Court has observed:

Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might "filter out some frivolous claims." And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Nussle,* 534 U.S. at 524–25 (citations omitted); *see also Flanagan,* 2002 WL 122921, at *2 (excusing failure to exhaust claim of due process violations at disciplinary hearing where plaintiff instead filed administrative appeal and thus gave "the state an opportunity to correct any errors and avoid [ ] premature federal litigation"); *Saunders,* 2002 WL 31159109, at *4 (section 1983 action dismissed where plaintiff's "[v]ague allegations" failed to "provide the internal grievance system with enough information to rectify the problem at the administrative level, which was what the PLRA intended to achieve"); *cf. Twitty v. Smith,* 614 F.2d 325, 331 (2d Cir.1979) (goal of exhaustion in habeas context is to "ensure that the federal courts not intrude upon state proceedings unless and until the state courts have been given a fair opportunity to consider and act upon the claims on which the habeas corpus petition is based").

[1] Because Khalid failed to raise the issue he raises here on his administrative appeal, he has not exhausted

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)

(Cite as: 2003 WL 42145 (S.D.N.Y.))

"such administrative remedies as are available" within the meaning of 42 U.S.C. § 1997e(a).

_____ 2. *Eighth Amendment Claim*

_____ In his complaint, Khalid alleges that Farrell "knowingly and willfully" violated Khalid's constitutional rights by forging documents requesting an extension. The forgery allegedly resulted in the disciplinary hearing not being held within the seven-day time frame required by regulation. *See* Complaint, ¶¶ 12, 16–17. Khalid claims this two-day delay amounted to cruel and unusual punishment in that it resulted in his unlawful confinement in SHU. *Id.,* ¶ 17.

**\*6** [2] To the extent this claim should be construed as forming part of Khalid's due process claim, it fails for the same reasons just stated. To the extent it is not part of the due process claim, it should have been the subject of a separate grievance. *See* 7 N.Y.C.R.R. § 701.2(a) (permitting grievances for any "complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a policy, regulation, procedure or rule"). Khalid has already conceded, however, that he failed to present any grievance at all. *See* Complaint, § II.B. Thus, this claim must be dismissed.

[3] Even if the merits were to be reached, an Eighth Amendment violation with respect to prison conditions is shown only where the deprivation is so "serious" that the deprivation " 'den[ied] the minimal civilized measure of life's necessities." ' *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). No such allegation has been made here. Indeed, *Anderson v. Coughlin,* 757 F.2d 33 (2d Cir.1985), specifically held that SHU conditions at the Sing Sing correctional facility did not constitute cruel and unusual punishment.

3. *Ninth Amendment Claim*

[4] This claim too must be dismissed because it was not raised on appeal from the disciplinary hearing and Khalid did not present it as part of a grievance. *See* Complaint, § II.B.

[5] In any event, the Ninth Amendment refers only to unenumerated rights and claims under section 1983 must be premised on specific constitutional guarantees. *See, e.g., Doe by Doe v. Episcopal Social Servs.,* 1996 WL 51191, at \*1 (S.D.N.Y. Feb.7, 1996). Thus, this claim even if exhausted would have to be dismissed on the merits as well. *See, e.g., Rose ex rel. Children's Rights Initiative, Inc. v. Zillioux,* 2001 WL 1708796, at \*4 (N.D.N.Y.2001) ( "Courts that have addressed the issue of whether the Ninth Amendment can serve as a basis for a § 1983 claim have unanimously held in the negative.") (citing cases).

III. *CONCLUSION*

Farrell's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted. To the extent the dismissal is predicated on a lack of exhaustion, the dismissal should be without prejudice. *See Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (dismissal for failure to exhaust should be without prejudice to refiling after exhaustion).

*Notice of Procedure for Filing of Objections to this Report and Recommendation*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any requests for an extension of time to file objections must be directed to Judge Kaplan, 500 Pearl Street, New York, New York 10007. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

January 7, 2003.

S.D.N.Y.,2003.

Khalild v. Reda
Not Reported in F.Supp.2d, 2003 WL 42145 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex."). A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief.' ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122911 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> FN17. The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> FN18. There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,
520 U.S. 641, 647 (1997)*). At the same time, "[p]rison
walls do not form a barrier separating prison inmates from
the protections of the Constitution." *Duamutef v. Hollins,
297 F.3d 108, 112 (2d Cir.2002)* (citation omitted). With
respect to Tier III hearings such as the one at issue here,
the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written
notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present
evidence "when permitting him to do so would not be
unduly hazardous to institutional safety or correctional
goals";

(3) the inmate be judged by a fair and impartial hearing
officer;

(4) the disciplinary conviction be supported by some
evidence; and

(5) the inmate be provided with a written statement of fact
findings that support the disposition as well as the reasons
for the disciplinary action taken.

*Espinal, 180 F.Supp.2d at 538* (citing *Wolff v.
McDonnell, 418 U.S. 539, 563-69 (1974)*) (internal
citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the
aforementioned rights under *Wolff. See* Reply Brief, at 13.
They argue, however, that Samuels received all the
procedural safeguards due him. Before analyzing
defendants points in detail, the Court notes the paucity of
the record before it. While Samuels has provided nearly
fifty exhibits, defendants have provided only a two-page
affidavit by Inmate Grievance Program Director Thomas
G. Eagen dated March 13, 2002, attached to which is a
nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit,
*inter alia,* a transcript of the disciplinary hearing, a
transcript or audio recording of the confidential witness
statements, a written basis for the rejection of Samuels'
witnesses, or a copy of the documents that were
supposedly seized from Samuels' cell. While the Court is
cognizant of the fact that the instant motion is not one for
summary judgment, without these and other documents, it
is difficult for this Court fully to evaluate the merits of the
parties' arguments. More troubling is the fact that this is
apparently not the first time an inmate has been sentenced
to a special housing unit on the basis of evidence which
has not been preserved for judicial review. Indeed, in
*Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS
9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by
defendants, the court noted that on more than one
occasion, Selsky was forced to reverse his previous
decision denying an inmate's appeal because the "record
of [the disciplinary] hearing was incomplete and the
'confidential tape' was 'unavailable for judicial review.'
' *Id.* at *9 (citation omitted). On the occasion cited by the
*Cherry* court, the inmate's record was expunged, but only
after the plaintiff had served 125 days in a special housing
unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were
violated because he was not permitted to call Dr.
Peter-Raoul as a witness at his disciplinary hearing. *See*
Complaint, at 9; Ex. V, at 2. Defendants state, without
explanation, that "it is clear that the proffered testimony
would have been irrelevant and redundant." Motion Brief,
at 13. The Court agrees with defendants that the right of an
inmate to call witnesses in his defense is not limitless.
Nevertheless, prison authorities' failure to allow an inmate
to call a witness may be grounds for reversal, where the
authorities fail to justify their actions. *See Ayers v. Ryan,
152 F.3d 77, 81 (2d Cir.1998).* In this case, Dr.
Peter-Raoul was apparently the author of some or all of
the "subversive" materials and had close ties to the
theological seminary program at the prison. According to
Samuels, she also "assisted plaintiff with his course
syllabus and provided much of the material utilized"
therein. Complaint, at 9. She was therefore in a unique
position to explain the appropriateness and relevance of
the materials allegedly possessed by Samuels, who had in
fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.'" *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See* Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g.,* Duckett v. Ward, 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g.,* Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g.,* Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at *10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition*." Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))



United States District Court, S.D. New York.

Abdul SHARIFF, Mark Bartley, Jamal Stephenson, David Gobern, Lewis Purcell, Sam Johnson, Terence Stevens, Stephen Gowins, and Abdul Suluk, Plaintiffs,
v.
Philip COOMBE, Commissioner of New York State Docs; Glen Goord, Acting Commissioner; Christopher Artuz, Superintendent of Green Haven Corr. Facility; Gail Haponic, Acting Deputy of Admin. of Green Haven; Roger Maines, Supervisor of Green Haven; M. Muller, Maintenance Supervisor of Green Haven, individually and in their official capacities, and the State of New York, Defendants.
No. 96 Civ. 3001(BSJ).

June 26, 2002.
*Memorandum & Order*

JONES, J.

### I. INTRODUCTION

**\*1** Plaintiffs, nine disabled prisoners who depend on wheelchairs for mobility, bring this action against the State of New York and six individuals employed by the New York State Department of Correctional Services ("DOCS") in an administrative capacity. Those six individuals, who are sued both in their individual and in their official capacities, are two former DOCS Commissioners and four administrators at Green Haven Correctional Facility ("Green Haven"), including the Superintendent, the former Plant Superintendent, a Deputy Superintendent, and a Maintenance Supervisor. Plaintiffs seek both injunctive and monetary relief for conditions affecting disabled inmates at Green Haven. The gravamen of the Fourth Amended Complaint [FN1] is that the conditions at Green Haven amount to unlawful discrimination against disabled inmates. These conditions allegedly violate (1) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; (2) Title V of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*; (3) Section 70 of the New

York State Correction Law; and (4) the Eighth and Fourteenth Amendments of the Constitution pursuant to 42 U.S.C. § 1983.

> FN1. Unless otherwise noted, references to the "Fourth Amended Complaint" refer to Plaintiffs' most recent Complaint, the Fourth Amended Complaint dated September 29, 1998.

Defendants move for summary judgment on several grounds pursuant to Federal Rule of Civil Procedure 56. Due to changes in the legal standards applicable to Plaintiffs' claims and the facts relevant to the issues of injunctive relief, exhaustion, and prior adjudication, the court must reserve decision on some issues at this time. In such circumstances, the court has identified issues for additional briefing by the parties in a second round of dispositive motions. Indeed, the complexity of those and other issues applicable to Plaintiffs' remaining claims may require a hearing for proper resolution. For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew.

### II. CLAIMS FOR INJUNCTIVE RELIEF

Any Plaintiff who is no longer incarcerated at Green Haven is barred from asserting a claim for injunctive relief regarding conditions at Green Haven. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citing cases). Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk are no longer incarcerated at Green Haven. Therefore, the court dismisses with prejudice all claims for injunctive relief brought by those six Plaintiffs.

Plaintiffs are not entitled to injunctive relief for those claims that are now moot because they have been addressed by prison officials. *See Prins v. Coughlin,* 76 F.3d 504, 506; *see also Farmer v. Brennan,* 511 U.S. 825, 846 (1994). Plaintiffs' injunctive claims as to the A & B yard have been rendered moot because Defendants have "repaired and repaved" this yard. (*See, e.g.,* Pls.' Mem. of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

Law in Opp'n to Defs.' Mot. for Summ. J. at 11.) Accordingly, all Plaintiffs, but particularly Plaintiffs Shariff and Stephenson, are precluded from seeking injunctive relief as to the conditions of the A & B yard that have been repaired, and the court dismisses those claims with prejudice.

**\*2** In light of the changes in both Plaintiffs' circumstances and the conditions at Green Haven that have occurred since this motion was filed, the court has been unable to address Plaintiffs' remaining claims for injunctive relief. For example, when this motion was filed, numerous repairs and renovations were scheduled for Green Haven. (*See* Turbin Aff. Ex. E.) If any such repairs were, in fact, conducted, Plaintiffs' claims for injunctive relief concerning those repairs would also be moot. The court directs the parties to address these issues, as well as other changes in the facts of this case that may affect the viability of Plaintiff's claims for injunctive relief, in the additional briefing ordered by the court.

### III. CLAIMS FOR MONETARY RELIEF

#### A. CLAIMS UNDER 42 U.S.C. § 1983

Absent express statutory abrogation or consent by a state to suit, the Eleventh Amendment bars suits brought in federal court against a state by citizens of another state or the state's own citizens. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72-73 (2000); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996). Section 1983 does not abrogate a state's immunity, *Quern v.. Jordan,* 440 U.S. 332, 343-45 (1979), and New York has not consented to suit in federal court, *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir.1977). State employees sued in their official capacities are also immune from suits for monetary damages under the Eleventh Amendment in cases where the state is the real party in interest. *See Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Moreover, "[s]tates[ ] and state officers, if sued in their official capacities for retrospective relief ... are not 'persons' subject to suit under § 1983." *K & A Radiological Tech. Services, Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). Therefore, the court dismisses Plaintiffs' claims for monetary relief pursuant to § 1983 against the State of New York and the other six

Defendants in their official capacities.

#### B. THE ADA AND THE REHABILITATION ACT [FN2]

> [FN2]. The ADA, which was adopted in 1992 and covers individuals and entities that do not receive federal funds, is broader in scope than the Rehabilitation Act, which was adopted in 1973 and is limited to programs receiving financial assistance from the federal government. *See Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77, 79 n. 1 (2d Cir.2000).

Neither Title II of the ADA nor Section 504 of the Rehabilitation Act provides for suits against state officials in their individual capacities. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Therefore, the court dismisses with prejudice Plaintiffs' claims under the ADA and the Rehabilitation Act against the six individual Defendants in their individual capacities.

The legal standards applicable to Plaintiffs' claims under the ADA and the Rehabilitation Act against the State of New York and the other six Defendants in their official capacities have changed during the pendency of this motion. The changes in the law render much of Defendants' briefing on these claims inapplicable. The court directs the parties to brief Plaintiffs' remaining claims under the ADA and the Rehabilitation Act in light of the standards set forth in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *See also Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659, at \*27-\*31 (S.D .N.Y. Apr. 24, 2002) (applying the standards set forth in *Garcia* ).

#### C. STATE LAW CLAIMS

**\*3** Plaintiffs raise state law claims alleging that Defendants have failed to fulfill their duties under Section 70 of the New York State Correction Law. The court dismisses Plaintiffs' claims under Section 70 against the State of New York and the six other defendants in both their personal and their official capacities for lack of subject matter jurisdiction pursuant to New York State Correction Law Section 24 and the Eleventh Amendment. *See Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

## IV. OTHER ARGUMENTS CONCERNING PLAINTIFFS' REMAINING CLAIMS

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' claims must be dismissed for failure to exhaust administrative remedies. Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA") on April 26, 1996, no action brought by a prisoner pertaining to prison conditions may be brought until all available administrative remedies are exhausted. *Porter v. Nussle,* 122 S.Ct. 983, 988 (2002); *see* 42 U.S.C. § 1997e(a) (Supp.2000) (as amended by PLRA § 803). While the mandatory exhaustion requirement of the PLRA does not apply retroactively, any claim filed after April 26, 1996, must be exhausted administratively before it may be raised in federal court. *See Salahuddin v. Mead,* 174 F.3d, 272, 275 (2d Cir.1999); *Blissett v. Casey,* 969 F.Supp. 118, 125 (N.D.N.Y.1997).

The court denies without prejudice to renew that portion of Defendants' motion seeking dismissal of Plaintiffs' claims for failure to exhaust administrative remedies. The court reserves final decision on the issues raised by Defendants' arguments relating to exhaustion for three reasons. First, the issue of exhaustion was briefed insufficiently by the parties to permit the court to rule. Specifically, the court requires a detailed, plaintiff-by-plaintiff analysis of the exhaustion requirements applicable to each claim and the actions taken by each Plaintiff. Second, the court recognizes that Plaintiffs may have pursued additional administrative remedies during the pendency of this motion. Third, changes in the law since briefing was submitted on this motion have clarified the exhaustion requirements applicable to each Plaintiff's claims. Depending on the exhaustion requirements applicable to each claim and the actions taken by individual Plaintiffs to pursue administrative relief, the court may lack jurisdiction over some of Plaintiffs' remaining claims. The court notes the following as guidance for the parties in fashioning future arguments:

Plaintiff Shariff's initial *pro se* Complaint was filed on February 27, 1996; therefore, the claims he alleged therein are not subject to mandatory exhaustion. Nevertheless, the court retains discretion and may require exhaustion with respect to the pre-PLRA claims raised by Plaintiff Shariff under certain circumstances. *See* 42 U.S.C. § 1997e(a) (1994) (amended 1996). The court expressly leaves open the questions of whether the court should, in its discretion, require exhaustion as to Plaintiff Shariff's claims and whether Plaintiff Shariff did, in fact, pursue administrative remedies with respect to the claims raised in this case.[FN3]

> **FN3.** Additionally, the parties have not addressed the question of whether any claims raised by Shariff in amendments to the initial Complaint filed after April 26, 1996, should be subject to the mandatory exhaustion requirements of the PLRA. The court reserves decision as to that issue.

**\*4** The other eight Plaintiffs first included their claims as part of the multiple amended complaints filed in this case after the exhaustion provisions were amended in 1996. Thus, it seems likely to the court that those eight Plaintiffs are required to have exhausted their claims prior to filing them in federal court. *Cf. Farber v. Wards Co., Inc.,* 825 F.2d 684, 689 (2d Cir.1987) (noting that "Rule 15(c) governs the 'relation back' of amended pleadings only for the purpose of the statute of limitations"). "Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff.... Rather, Rule 15(c) stands as a remedial device for adding or substituting a party who 'but for a mistake concerning the identity of the proper party' would have been named originally." *Morin v. Trupin,* 778 F.Supp. 711, 735 (S.D.N.Y.1991). Thus, the decision by the other eight Plaintiffs, who raise many claims distinct from those initially filed by Plaintiff Shariff in his *pro se* Complaint, to file their claims as part of this case rather than filing their own lawsuits is unlikely to have obviated the PLRA's mandatory exhaustion requirement with respect to their claims. Since this issue has not been addressed in the light of current case law, the court reserves decision on this issue as well.

### B. PRIOR ADJUDICATION

When briefing was submitted on this motion, some of Plaintiffs' claims already had been adjudicated or were

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

pending in other fora. (Defs.' Reply Mem. for Summ. J., Table C.) Defendants argue for dismissal of Plaintiffs' claims on the basis of such prior adjudication, which may preclude Plaintiffs from raising those claims in this court. See *Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659 (S.D.N.Y. Apr. 24, 2002) (discussing interaction between preclusion rules and abstention doctrines). Once again, the court has not been provided with enough detail of the claims raised by Plaintiffs in other proceedings to determine whether preclusion rules, abstention doctrines, or principles concerning double recoveries would bar any of the claims raised in the Fourth Amended Complaint, and Defendants have not addressed those topics substantively in their briefing on this motion. Thus, the court denies without prejudice to renew Defendants' motion to dismiss Plaintiffs' claims as a result of prior adjudication.

## C. PRIOR PHYSICAL INJURY REQUIREMENT

Pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Claims by prisoners brought pursuant to § 1983 for emotional damages unrelated to any physical injuries are subject to dismissal. See, e.g., *Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (finding failure to make an objective showing of actual injury necessary to state an Eighth Amendment claim based on prison conditions); *Siglar v. Hightower,* 112 F.3d 191, 193-94 (5th Cir.1997) (finding bruised ear an insufficient physical injury to overcome bar of § 1997e(e)); *Zehner v. Trigg,* 952 F.Supp. 1318, 1322-23 (S.D.Ind.) (dismissing claim based on prisoners' exposure to asbestos), *aff'd* 133 F.3d 459, 461 (7th Cir.1997); *Brazeau v. Travis,* No. 96 CV 783, 1996 WL 391701, at *1 (N.D.N.Y. July 9, 1996) (holding that claim for emotional damages caused by delay in receipt of parole hearing transcript was barred by § 1997e(e)).

**\*5** The absence of a physical injury does not constitute a total bar to claims by prisoners under § 1983, since application of § 1997e(e) does not bar claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Wagnoon v. Gatson,* 00 Civ. 3722 and 99 Civ. 5872, 2001 U.S. Dist. LEXIS 8417, at *12-*13 (June 25, 2001). Nevertheless, Plaintiffs' claims for

compensatory damages relating to non-physical accidents, particularly those raised by Plaintiffs Gobern, Johnson, and Purcell, may not meet the physical injury requirement of the PLRA. The court expressly leaves open the question of whether any Plaintiff can meet the prior physical injury requirement, which has been inadequately briefed on a plaintiff-by-plaintiff basis. Indeed, Defendant raises this issue only briefly in the context of argument presented as to the standard applicable to claims of a deprivation of rights under the Eighth Amendment. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 30-31.)

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew. The following claims raised in the Fourth Amended Complaint are dismissed with prejudice: claims by Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk for injunctive relief; all claims for injunctive relief as to the conditions of the A & B yard that have been repaired; all claims against the State of New York and the other six Defendants in their official capacities for monetary relief pursuant to § 1983; all claims against the six individual Defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act; and all claims against all Defendants under Section 70 of the New York State Correction Law. The remainder of Defendants' Motion for Summary Judgment is denied without prejudice to renew.

The court directs the parties to appear before the court for a conference at 3:00 p.m. on Tuesday, July 2, 2002, prepared to discuss Plaintiffs' remaining claims and current conditions at Green Haven. If Defendants choose to submit additional briefing, such briefing must be submitted as a renewed motion for summary judgment filed within thirty days of the date of this Memorandum and Order.

SO ORDERED:

S.D.N.Y.,2002.

Shariff v. Coombe
Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.[FN1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

> FN1. The claims brought by the plaintiff that
> survived summary judgment were tried before a
> jury on October 4, 1998. On October 6, 1998,
> the jury returned a verdict for LaBounty on his
> claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. LaBounty v. Kinkhabwala, No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. LaBounty v.
Coombe, et al., No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.[FN2]

> FN2. To the extent that the plaintiff reiterates in
> his opposition claims that have been previously
> dismissed or makes new claims unrelated to the
> issues which have been remanded, those claims
> are not properly before this Court and the Court
> does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules.' " *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:

(a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.

(b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.

(c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> FN7. The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> FN8. The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> FN9. The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**\*8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

## I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety.[FN1] Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

> FN1. Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

## II. ANALYSIS

### A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5– *6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at \*2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.
>
> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense." ' *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera, 1994 WL 263417,* at [*]6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at [**]2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at [**]2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

**9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr. Facility; James A. Mance, Deputy Superintendent of Programs; John O'Reilly,[FN1] Deputy Superintendent; J. Burge, First Deputy; M. Maher, DSS; R. Centore, Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights when they retaliated against him for his activities as an IGRC representative by subjecting him to verbal harassment, physical abuse and subsequently, a transfer. Garrett also claims that the supervisory defendants failed to properly investigate his complaints and failed to train/supervise their employees. This court recommends denying the motion for summary judgment in part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint against the defendants claiming that they violated his civil rights under the First, Sixth Eighth, and Fourteenth Amendments.[FN3] On September 28, 2001, the defendants filed a motion for summary judgment. On January 18, 2002, this court issued an order informing Garrett of his obligation to file a response and extended his time to respond for thirty days. On April 24, 2002, this court granted an additional sixty days to respond to the defendants' motion. Despite having been given multiple opportunities to respond, Garrett has failed to file a response.

> FN3. Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id. at 470-71.*

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Jan. 24, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, was initially
referred to Magistrate Judge George H. Lowe for Report
and Recommendation by the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon
Magistrate Judge Lowe's retirement on February 9, 2012,
the case was reassigned to me. Plaintiff Phillip
Jean–Laurent ("Jean–Laurent") has brought this action
against Defendants Correctional Officers Patrick Lane
("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall
("Tyndall"); Correctional Sergeants Matthew Beard
("Beard") and David Pawlin ("Pawlin") (sued incorrectly
as "Sgt. Pauline"); Correctional Lieutenant Norman Jones
("Jones"); Deputy Superintendent Security Brian
McAuliffe ("McAuliffe"); Superintendents Warren

Barkley ("Barkley") and William Hulihan ("Hulihan");
Appeal Review Officer Norman Bezio ("Bezio"); Deputy
Commissioner Christopher Lindquist ("Lindquist") (sued
incorrectly as "Dep. Comm. Linquist"); Dr. Charles
Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John
Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt. Nos.
1, ¶¶ 9–16, and 6–17.FN1)

> FN1. Page numbers in citations to filed
> documents refer to the page numbers assigned by
> the Court's electronic filing system rather than to
> the page number in the original document.

Defendants, with the exception of the four Doe
Defendants who have not yet been identified and served,
now move to dismiss Plaintiff's Complaint for failure to
state a claim under Federal Rule of Civil Procedure
12(b)(6). FN2 (Dkt. No. 23.) For the reasons set forth
below, the Court recommends that Defendants' motion be
**GRANTED** in part and **DENIED** in part.

> FN2. Because the Doe Defendants have been
> excluded from the motion, this Report and
> Recommendation does not address the legal
> sufficiency of the claims asserted against them in
> the Complaint.

### I. BACKGROUND FN3

> FN3. The background facts set forth herein are
> taken from Plaintiff's Complaint.

**A. Facts Concerning Plaintiff's Claims Arising Out of
his Storage of Draft Bags and the Destruction of His
Legal Documents**

Plaintiff is a former prisoner of the New York State
Department of Correctional and Community Supervision
("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008,
Plaintiff was transferred from Elmira Correctional Facility
("Elmira") to Cape Vincent Correctional Facility ("Cape
Vincent"). *Id.* at ¶ 17. Eight draft bags containing
Plaintiff's personal property were sent from Elmira to
Cape Vincent at the time of the transfer. *Id.* Plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

personal belongings did not all fit into the storage lockers provided for his use at Cape Vincent, so he stored personal legal documents and materials and books in two draft bags placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer at the time, advised Plaintiff that he could not store belongings in draft bags and would have to purchase storage containers from the commissary for his excess belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id .* at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[FN4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the

SITU.

FN4. Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:

Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.

A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[FN5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

FN5. Plaintiff has not identified the nature of the

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

**B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio**

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[FN6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of

the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

> FN6. It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.* at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

**C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe**

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

### D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

### II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

### III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).[FN7]

> FN7. Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition

papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

> The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

**B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants**

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

effectively arms of the state ( *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

**C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals**

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011)

(Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [FN8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

> **FN8.** The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

**D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs**

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8** To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary

record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

*1. Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings [FN9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

> FN9. *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

**\*9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York, No. 03 Civ. 7576(NRB), 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (S.D.N.Y. May 3, 2005)* (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher, No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*41 (N.D.N.Y. Feb.29, 2012)* (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash, No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at \*6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006)* (Kahn D.J., Homer, M.J.) (same); *Kotler v. Daby, No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011)* (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer, 682 F.Supp.2d 423, 433*

*(S.D.N.Y.2010)* (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse actions by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville, 224 F.Supp.2d at 732.* In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

### 2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly, No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012)* (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore, I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at *14, 2012 U.S. Dist. LEXIS 39116, at *14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, *3, 2005 U.S. Dist. LEXIS 7903, at *10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at *9, 2012 U.S. Dist. LEXIS 12193, at *24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

analysis, I recommend that Plaintiff be granted leave to amend should he be able to plead specific facts supporting causation.[FN10]

> FN10. *See Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

**E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702–03.* The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer, 511 U.S. at 825; Ross v. Giambruno, 112 F.3d 505 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105–6.*

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith, 316 F.3d at 185.* Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. Claim of Cruel and Inhuman Treatment By Defendant Pawlin

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837.* Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing

society," *Estelle, 429 U.S. at 102,* Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

### 2. Claim of Medical Indifference Against Defendant Moehs

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance, 143 F.3d at 703.* Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim. [FN11] *See Guarneri v. Hazzard, No. 9:06–CV–0985, 2008 WL 552872, at \*6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008)* (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas, No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at \*14, 2002 U.S. Dist. LEXIS 17359, at \*50 (S.D.N.Y. Sept. 17, 2002)* (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion. [FN12] Therefore, the Court recommends that Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

FN11. Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

FN12. If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

3. *Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU*

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and

Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) ("*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal,[FN13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[FN14]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

FN13. There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

FN14. The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

4. *Claim of Indifference to Serious Medical Needs Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at \*12, 2002 U.S. Dist. LEXIS 7067, at \*43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at \*13,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

**G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio**

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

1. *Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags*

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe [FN15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

> FN15. Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones.[FN16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

> **FN16.** The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges.[FN17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

> **FN17.** The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

### 2. *Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 *at* ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id.* at 64, the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19** Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's

rights through an appeal, he failed to remedy the wrong. *Colon,* 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J .) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); *Moore v. Scully,* No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20** Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

**H. Plaintiff's Pendent State Claims**

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it

precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at *21, 2012 U.S. Dist. LEXIS 39232, at *60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at *4–5, 2010 U.S. Dist. LEXIS 104641, at *15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *16, 2010 U.S. Dist. LEXIS 124737, at *47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at *18, 2010 U.S. Dist. LEXIS 10799, at *61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be *GRANTED IN PART AND DENIED IN PART.* Specifically, the Court recommends that Defendants' motion be *GRANTED* as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin,

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be **DENIED** as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 600213 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 599893 (N.D.N.Y.)

(Cite as: 2013 WL 599893 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Feb. 15, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### *ORDER*

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation by Magistrate Judge Therese
Wiley Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's ReportRecommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in
its entirety.

2. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 599893 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.